### DREWS ET AL. *v.* STATE

[No. 113, September Term, 1960.]

*Decided January 18, 1961.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Francis D. Murnaghan, Jr.,* with whom were *Robert B. Watts, Robert J. Martineau,* and *Venable, Baetjer & Howard* on the brief, for appellants.

*Joseph S. Kaufman, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *Frank H. Newell, 3rd, State's Attorney for Baltimore County,* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

The four appellants were convicted by the court sitting without a jury of violating Code (1957), Art. 27, Sec. 123, by "acting in a disorderly manner to the disturbance of the public peace" in a "place of public resort or amusement." Two of appellants are white men, one is a white woman, and the other a Negress. Accompanied by a Negro who was not tried, they had gone as a group to Gwynn Oak Amusement Park in Baltimore County, which as a business policy does not admit Negroes, and were arrested when they refused to leave after being asked to do so.

Appellants claim that there was no evidence that the Park is a place of public resort or amusement, that if there were such evidence the systematic exclusion of Negroes prevents the Park from being regarded as such a public place, that they were not guilty of disorderly conduct and, finally, if the Park is a place of public resort or amusement their presence there was in the exercise of a constitutional right, and their arrest

and prosecution amounted to State action to enforce segregation in violation of the Constitution of the United States.

There is no direct statement in the record that the Park is a place of public resort or amusement but we think the evidence clearly permitted the finding the trial court made that it is. There was testimony which showed, or permitted the inference, that the Park is owned by a private corporation, that it has been in operation each summer for many years, that among its attractions are a miniature golf course and a cafeteria, that appellants' conduct occurred on "All Nations Day" which usually attracts a large crowd, that on that day the Park was so crowded there was but elbow room to walk, and that the Park's policy was to welcome everyone but Negroes. The trial court properly could have concluded the Park is a place resorted to by the general public for amusement. Cf. *Iozzi v. State,* 224 Md. 42.

A lawmaking body is presumed by the Courts to have used words in a statute to convey the meaning ordinarily attributed to them. In recognition of this plain precept the Courts, in construing zoning, licensing, tax and anti-discrimination statutes, have held that the term place of public resort or amusement included dance halls, swimming pools, bowling alleys, miniature golf courses, roller skating rinks and a dancing pavilion in an amusement park (because it was an integral part of the amusement park), saying that amusement may be derived from participation as well as observation. *Amos v. Prom, Inc.,* 117 F. Supp. 615; *Askew v. Parker* (Cal. App.), 312 P. 2d 342; *Jaffarian v. Building Com'r of City of Somerville* (Mass.), 175 N. E. 641; *Jones v. Broadway Roller Rink Co.* (Wis.), 118 N. W. 170, 171; *Johnson v. Auburn & Syracuse Electric R. Co.* (N. Y.), 119 N. E. 72. Section 123 of Art. 27 proscribes conduct which disturbs the public peace at a place where a number of people are likely to congregate, whether it is on governmental property or on property privately owned. This is made clear by the prohibition of offensive conduct not only on any public street or highway but in any store during business hours, and in any elevator, lobby or corridor of an office building or apartment house having more than three dwelling units, as well as in any place of public

worship or any place of public resort or amusement. We read the statute as including an amusement park in the category of a place of public resort or amusement.

We find no substance in the somewhat bootstrap argument that the regular exclusion of Negroes from the Park kept it from being within the ambit of the statute. Early in the common law the duty to serve the public without discrimination apparently was imposed on many callings. Later this duty was confined to exceptional callings as to which an urgent public need called for its continuance, such as innkeeper and common carriers. Operators of most enterprises, including places of amusement, did not and do not have any such common law obligation, and in the absence of a statute forbidding discrimination, can pick and choose their patrons for any reason they decide upon, including the color of their skin. Early and recent authorities on the point are collected, and exhaustively discussed, in the opinion of the Supreme Court of New Jersey in *Garifine v. Monmouth Park Jockey Club,* 148 A. 2d 1. See also *Greenfeld v. Maryland Jockey Club of Baltimore,* 190 Md. 96; *Good Citizens Community Protective Ass'n v. Board of Liquor License Commissioners of Baltimore City,* 217 Md. 129, 131; *Slack v. Atlantic White Tower System, Inc.,* 181 F. Supp. 124; *Williams v. Howard Johnson's Restaurant,* 268 F. 2d 845.

It has been noted in the cases that places of public accommodation, resort or amusement properly can exclude would-be patrons on the grounds of improper dress or uncleanliness, *Amos v. Prom, Inc., supra* (at page 629 of 117 F. Supp.); because they are under a certain age, are men or are women, or are unescorted women, *Collister v. Hayman* (N. Y.), 76 N. E. 20; or because for some other reason they are undesirables in the eyes of the establishment. *Greenfeld v. Maryland Jockey Club; Good Citizens Community Protective Ass'n v. Board of Liquor License Com'rs; Slack v. Atlantic White Tower System, Inc.,* all *supra.* See 86 C.J.S. *Theaters and Shows,* Secs. 31 and 34 to 36. We have found no decision holding that a policy of excluding certain limited kinds or classes of people prevents an enterprise from being a place of

public resort or amusement, and can see no sound reason why it should.

Appellants' argument that they were not disorderly is that neither the mere infringement of the rules of a private establishment nor a simple polite trespass constitutes either a breach of the peace or disorderly conduct. We find here more than either of these, enough to have permitted the trier of fact to have determined as he did that the conduct of appellants was disorderly.

It is said that there was no common law crime of disorderly conduct. Nevertheless, it was a crime at common law to do many of the things that constitute disorderly conduct under present day statutes, such as making loud noises so as to disturb the peace of the neighborhood, collecting a crowd in a public place by means of loud or unseemly noises or language, or disturbing a meeting assembled for religious worship or any other lawful purpose. *Hochheimer on Crimes and Criminal Procedure,* Sec. 392 (2nd Ed.) ; *1 Bishop on Criminal Law,* Sec. 542 (9th Ed.) ; *Campbell v. The Commonwealth,* 59 Pa. St. Rep. 266.

The gist of the crime of disorderly conduct under Sec. 123 of Art. 27, as it was in the cases of common law predecessor crimes, is the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area. 3 Underhill, *Criminal Evidence,* Sec. 850 (5th Ed.), adopts as one definition of the crime the statement that it is conduct "of such a nature as to affect the peace and quiet of persons who may witness the same and who may be disturbed or provoked to resentment thereby." Also, it has been held that failure to obey a policeman's command to move on when not to do so may endanger the public peace, amounts to disorderly conduct. *Bennett v. City of Dalton* (Ga. App.), 25 S. E. 2d 726, appeal dismissed, 320 U. S. 712, 88 L. Ed. 418. In *People v. Galpern* (N. Y.), 181 N. E. 572, 574, it was said, under a New York statute making it unlawful to congregate with others on a public street and refuse to move on when ordered by the police, that refusal to obey an order of a police officer, not exceeding his authority, to move on "even though conscientious—may inter-

fere with the public order and lead to a breach of the peace," and that such a refusal "can be justified only where the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order." See also *In re Neal*, 164 N. Y. S. 2d 549 (where the refusal of a school girl to leave a school bus when ordered to do so by the authorities was held to be disorderly conduct, largely because of its effect on the other children); Underhill, in the passage cited above, concludes that "failure to obey a lawful order of the police, however, such as an order to move on, may amount to disorderly conduct." See also *People v. Nixson* (N. Y.), 161 N. E. 463; 27 C.J.S. *Disorderly Conduct*, Sec 1(4) f; annotation 65 A.L.R. 2d 1152; compare *People v. Carcel* (N. Y.), 144 N. E. 2d 81; and *People v. Arko*, 199 N. Y. S. 402.

Appellants refused to leave the Park although requested to do so many times. A large crowd gathered around them and the Park employee who was making the requests, and seemed to "mill in and close in" so that the employee sent for the Baltimore County police. The police, at the express direction of the manager of the Park, asked the appellants to leave and again they refused, even when told they would be arrested if they did not. Admittedly they were then deliberately trespassing. That they intended to continue to trespass until they were forcibly ejected is made evident by their conduct when told they were under arrest. The five joined arms as a symbol of united defiance and then two of the men dropped to the ground. Two of appellants had to be carried from the Park, the other three had to be pushed and shoved through the crowd. The effect of the appellants' behavior on the crowd is shown by the testimony that some of its members spit and kicked and shouted threats and imprecations, and that the Park employees feared a mob scene was about to erupt. The conduct of appellants in refusing to obey a lawful request to leave private property disturbed the public peace and incited a crowd. This was enough to sustain the verdict reached by Judge Menchine.

We turn to appellants' argument that the arrest by the County police constituted State action to enforce a policy of segregation in violation of the ban of the Equal Protection and

Due Process clauses of the Fourteenth Amendment against State-imposed racial discrimination. The Supreme Court said in the racial covenant case of *Shelley v. Kraemer,* 334 U. S. 1, 13, 92 L. Ed. 1161, 1180: "[T]he action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." The Park had a legal right to maintain a business policy of excluding Negroes. This was a private policy which the State neither required nor assisted by legislation or administrative practice. The arrest of appellants was not because the State desired or intended to maintain the Park as a segregated place of amusement; it was because the appellants were inciting the crowd by refusing to obey valid commands to move from a place where they had no lawful right to be. Both white and colored people acted in a disorderly manner and the State, without discrimination, arrested and prosecuted all who were so acting.

While there can be little doubt that the Park could have used its own employees to eject appellants after they refused to leave, if it had attempted to do so there would have been real danger the crowd would explode into riotous action. As Judge Thomsen said in *Griffin v. Collins,* 187 F. Supp. 149, 153, in denying a preliminary injunction and a summary judgment in a suit brought to end the segregation policy of the Glen Echo Amusement Park near Washington: "Plaintiffs have cited no authority holding that in the ordinary case, where the proprietor of a store, restaurant, or amusement park, himself or through his own employees, notifies the Negro of the policy and orders him to leave the premises, the calling in of a peace officer to enforce the proprietor's admitted right would amount to deprivation by the state of any rights, privileges or immunities secured to the Negro by the Constitution or laws. Granted the right of the proprietor to choose his customers and to eject trespassers, it can hardly be the law, as plaintiffs contend, that the proprietor may use such force as he and his employees possess but may not call on a peace officer to enforce his rights."

The Supreme Court has not spoken on the point since Judge

Thomsen's opinion. The issue was squarely presented for decision in *Boynton v. Virginia*, 364 U. S. 454, 5 L. Ed. 2d 206, but the Court chose to decide the case on the basis that the conviction of a Negro for unlawfully remaining in a segregated bus terminal restaurant violated the Interstate Commerce Act, which uses broad language to forbid a carrier from discriminating against a passenger. In the absence of controlling authority to the contrary, it is our opinion that the arresting and convicting of appellants on warrants sworn out by the Park for disorderly conduct, which resulted from the Park enforcing its private, lawful policy of segregation, did not constitute "such action as may fairly be said to be that of the States." It was at least one step removed from State enforcement of a policy of segregation and violated no constitutional right of appellants.

*Judgments affirmed, with costs.*