STATE v. ANNA COBB, CARSON NORWOOD SUTTON AND FREEMAN NICK OATES.

(Filed 12 June 1964.)

**1. Trespass § 12—**

The proprietor of a private business has the right to select the clientele he will serve and, if he so desires, may arbitrarily exclude from his premises any individual or group of individuals for any reason satisfactory to himself, and his right to be protected against wrongful invasion of his property and his right to maintain undisputed possession is protected by G.S. 14-134, rendering it a criminal trespass for a person to refuse to leave the premises after having been requested to do so by the person in lawful possession.

**2. Same—**

The amusement business is not one affected with a public interest, and therefore the proprietor of a theatre, unlike an innkeeper or public carrier, may admit or exclude any person for any reason satisfactory to himself.

**3. Criminal Law § 1—**

    A man's conduct must be judged by the law as it exists at the time his conduct is called into question and not by the law as he and others think it should be rewritten in the interest of social justice.

**4. Constitutional Law § 10—**

    It is the function of the courts to declare the law and not to make it, and therefore if a law should be changed, only the Legislature and not the judiciary may properly change it.

**5. Trespass § 12—**

    Where the parties are cognizant of the policy of a theatre to segregate its white and colored patrons, colored persons, having procured tickets previously purchased by a white person, may not assert that as the holder of such tickets they are entitled to be seated in the section reserved for white patrons, and such claim cannot be under a *bona fide* belief that they have a legal right to be seated in the section. G.S. 14-134.

APPEAL by defendants from *Williams, J.,* January 6, 1964 Session of CUMBERLAND.

On June 26, 1963 each of the three defendants was convicted in the Fayetteville City Recorder's Court upon a warrant which charged that on June 11, 1963 he "unlawfully and willfully and intentionally did go and enter upon the lands of the North Carolina Theatre, Inc., Colony Theatre without a license therefor, and did willfully and unlawfully remain on said premises after being asked to leave the Colony Theatre by the said E. W. Wray, Manager, this being in violation of G.S. 14-134." Each defendant was convicted and fined twenty-five dollars. Each appealed to the Superior Court where the three cases were consolidated for trial. At the conclusion of the State's evidence, the defendants moved for judgment as of nonsuit. The motion was overruled. They elected to offer no evidence and again renewed their motion. The motion was again denied. The jury returned a verdict of "guilty as charged as to each defendant." The judgment was that each be imprisoned in the county jail for sixty days and pay a fine of ten dollars together with the court costs. The prison sentence was suspended upon payment of the fine and costs. Each defendant appealed.

*Attorney General Bruton and Deputy Attorney General Ralph Moody for the State.*

*Arthur L. Lane and Sylvia X. Allen for defendants.*

SHARP, J. The defendants' assignments of error present only the question of nonsuit. Other purported assignments do not comply with our Rules 19(3) and 21 as they have repeatedly been interpreted by

this Court. *Gibbs v. Gaimel,* 257 N.C. 650, 127 S.E. 2d 271; *Pratt v. Bishop,* 257 N.C. 486, 126 S.E. 2d 597; see also the annotations to the Rules.

The evidence offered by the State tends to establish these undisputed facts: On June 11, 1963, it was the policy and practice of the Colony Theater to seat Negroes in the balcony and white patrons in the orchestra section. In other words, the Colony was a segregated theater. It had a dual ticket office. From its right side, tickets were sold to whites; from its left, to the colored customers. This arrangement, custom, and rule of the business was well known. The first three tickets sold after 4:00 p.m. on June 11th were sold by the manager, E. S. Wray, to a white man whose identity was unknown to him. These tickets were numbered M-380959, M-380960, M-380961 and were to the downstairs section of the theater. That night while a movie was being shown, the three defendants, all Negroes, appeared in the outer lobby between the ticket office and the first set of doors which gave entrance to the orchestra section and tendered tickets numbered M-380959, M-380960, and M-380961. Wray instructed the ticket taker not to accept their tickets and twice requested the defendants not to enter the downstairs section but to go to the balcony reserved for colored patrons. The three defendants ignored the manager's request and remained in the doorway completely blocking the entrance to the auditorium for seven or eight minutes. He then closed these doors and admitted the line of white patrons into the theater through the exit doors. The defendants moved to this line. A police officer of the City of Fayetteville, who was on the scene, identified himself to the defendants and requested them to surrender their tickets to him, and they did so. The manager again told the defendants not to enter the auditorium but they went past him and sat down. He followed and asked them once more to go to the balcony section. They continued to sit without replying. In the presence of the police he again asked the defendants to go to the balcony; the police made the same request. Again the defendants failed to respond in any manner. The manager then requested the police to arrest and remove the defendants. The officers placed defendants under arrest and left the theater with them. The defendants asked for no refund on the tickets and none was tendered.

The decision of this case is controlled by *State v. Clyburn,* 247 N.C. 455, 101 S.E. 2d 295, and *State v. Davis,* 261 N.C. 463, 135 S.E. 2d 14. It is the law in North Carolina today that the proprietor of a private business has the right to select the clientele he will serve and, if he so desires, he may arbitrarily exclude from his premises any individual or group of individuals. Therefore, he may select his customers or patrons upon the basis of sex, color, creed, or caprice.

This power of selection and exclusion is a right which is protected by law and one which has always been regarded as basic to the institution of private property. A violator of this right is punished as provided in G.S. 14-134. Such a right, without remedy of enforcement by law, would be no right at all — merely an invitation to an invasion by superior force with resulting violence and anarchy. The removal of a trespasser, whether he be white or Negro, from an owner's premises by the police does not constitute state action to enforce segregation and is not prohibited by the Fourteenth Amendment to the Federal Constitution. This contention of the defendants was decided adversely to them in *State v. Davis, supra,* and *State v. Williams,* 253 N.C. 804, 117 S.E. 2d 824, *petition for cert. filed,* 29 U.S.L. Week 3319 (U.S. April 20, 1961) (No. 915). The law does not look to the motive of the proprietor but to the wrongful invasion of his property and to the disturbance of his right to undisputed possession. 37 N.C.L. Rev. 73, 76.

In a similar case in Maryland in which defendants contended that their arrest and conviction for trespass was unconstitutional enforcement by the State of Maryland of racial segregation, the Court of Appeals said:

> "As we see it, the arrest and conviction of these appellants for a criminal trespass as a result of the enforcement by the operator of the park of its lawful policy of segregation, did not constitute such action as may fairly be said to be that of the State. The action in this case, as in *Drews,* (*Drews v. State,* 224 Md. 186, 167 A. 2d 341), was also 'one step removed from State enforcement of a policy of segregation and violated no constitutional right of appellants'." *Griffin v. State,* 225 Md. 422, 171 A. 2d 717, *cert granted,* 370 U.S. 935.

The *Clyburn, Davis,* and *Williams* cases, cited above, involved a lunch counter, restaurant, and soda fountain respectively. However, it is equally well settled that in the control of his own business, the proprietor of a privately owned place of amusement may admit or exclude any person for any reason satisfactory to himself or for no reason whatever. In the absence of civil rights legislation, and North Carolina has none, the law imposes no obligation upon the owner or proprietor of a theater or other public amusement with respect to whom he shall admit or exclude. Unlike a public utility, his business is not affected with a public interest, and he is under no legal obligation to admit every person who applies and is ready to pay the price of admission. 52 Am. Jur., *Theaters, Shows, etc.* § 6; 10 Am. Jur. *Civil Rights* § 22; *Terrell Wells Swimming Pool v. Rodriguez,* Tex., 182 S.W.

2d 824. His license to operate is not a franchise for "with the possible exception of ancient Rome — amusement of the populace has never been regarded as a function or purpose of government." *Madden v. Queens County Jockey Club*, 296 N.Y. 249, 72 N.E. 2d 697, 1 A.L.R. 2d 1160, *cert. denied*, 332 U.S. 761.

> "Historically, apart from 'innkeepers,' 'public carriers,' and the like, the proprietor of a business can deal with his patrons as he likes — denying service to some and not to others. This right to deny service was recognized by the English common law and some fifty years ago by the United States Supreme Court. Such is the law except in the twenty-six states that recently enacted laws prohibiting such discrimination." Pollitt, Dime Store Demonstrations, 1960 Duke L. J. 315, 352.

The rule, as it exists in North Carolina, is stated in 52 Am. Jur., *Theaters, Shows, etc.* § 4: "It is the majority rule in this country that a ticket of admission to a theater or place of public amusement confers on a purchaser thereof a mere license to witness the performance, which the owner or proprietor may revoke at will, either before or after admission of the ticketholder, and that in the absence of aggravating circumstances, a revocation is actionable only as a breach of contract. . . ." The measure of damages in such an action is usually held to be limited to the amount paid for the ticket and the necessary expenses incurred in attending the performance. 52 Am. Jur., *Theaters, Shows, etc.* § 12.; *Griffin v. Southland Racing Corp.*, Ark., 370 S.W. 2d 429; *De La Ysla v. Publix Theatres Corporation*, 82 Utah 598, 26 P. 2d 818.

A man's conduct must be judged by the law as it exists at the time his conduct is called into question and not by the law as he and others think it should be rewritten in the interest of social justice. In no other way can orderly government be preserved and a "reign of tooth and claw" be prevented. If the law is to be changed, it is the firm conviction of this Court that our system requires it to be changed by the legislative branch of the government and not by the judiciary. When a court, in effect, constitutes itself a superlegislative body, and attempts to rewrite the law according to its predilections and notions of enlightened legislation, it destroys the separation of powers and thereby upsets the delicate system of checks and balances which has heretofore formed the keystone of our constitutional government.

To constitute the offense forbidden by G.S. 14-134 and with which defendants are charged, "there must be an entry on land after being forbidden; and such entry must be wilful, and not from ignorance, ac-

cident, or under a *bona fide* claim of right or license." *State v. Bryson,* 81 N.C. 595. However, a mere belief on the part of a trespasser that he had such a claim will not protect him; he must satisfy the jury that he had reasonable grounds for such belief. *State v. Crawley,* 103 N.C. 353, 9 S.E. 409; *State v. Fisher,* 109 N.C. 817, 13 S.E. 878; *State v. Cooke,* 248 N.C. 485, 103 S.E. 2d 846, *appeal dismissed sub nom., Wolfe v. North Carolina,* 364 U.S. 177.

Here, there is no evidence that defendants entered the orchestra section of the Colony Theater under a *bona fide* belief that they had a *legal* right to do so. The fact that they held tickets to the downstairs section at the time is no defense. The theater did not sell these tickets to the defendants. As they well knew, they could not have purchased them. The tickets were obtained by subterfuge for the very purpose of creating a situation which would result in their arrest. Therefore, they may not claim the right to enter and remain in the theater after being forbidden so to do upon any status as ticketholders.

In *Griffin v. State, supra,* a group of Negroes entered Glen Echo, a segregated amusement park, and went to the carrousel. They had tickets which a white person had previously purchased for them and which the park attendant refused to honor. When they declined to leave the park after being asked to go, they were arrested upon a warrant charging them with trespass. On appeal, the Maryland defendants made the identical arguments which the defendants make in the case *sub judice.* In sustaining a conviction the Court of Appeals said:

> "Since it was admitted that the carrousel tickets were obtained surreptitiously in an attempt to 'integrate' the amusement park, we think the claim that these appellants had taken seats on the carrousel under a bona fide claim of right is without merit. While the statute specifically excludes the 'entry upon or crossing over' privately owned property by a person having a license or permission to do so, these appellants do not come within the statutory exception. In a case such as this where the operator of the amusement park — who had a right to contract only with those persons it chose to deal with — had not knowingly sold carrousel tickets to these appellants, it is apparent that they had no bona fide claim of right to a ride thereon, and, absent a valid right, the refusal to accept the tickets was not a violation of any legal right of these appellants."

In the trial below we find
No error.