914 A.2d 1182

George Junior SPRY

v.

STATE of Maryland.

No. 42 Sept. Term, 2006.

Court of Appeals of Maryland.

Jan. 16, 2007.

George E. Burns, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, MD, for petitioner.

Gary E. O'Connor, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, MD, for respondent.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

Opinion by BATTAGLIA, J.

Petitioner, George Junior Spry, seeks review of a judgment of the Court of Special Appeals affirming his conviction for failure to obey a police officer's reasonable and lawful order to prevent a disturbance to the public peace, in violation of Section 10–201(c)(3) of the Criminal Law Article, Maryland Code (2002),[1] where Spry had been arrested after a warrant was secured on the day following the disturbance. We hold that a police officer does not have to arrest an individual immediately after the first disobedience of a lawful order made to prevent a disturbance to the public peace, nor does he have to arrest at the scene in order to initiate prosecution under Section 10–201(c)(3).

## I. Introduction

During the evening of April 19, 2004, between 6:00 and 8:00 p.m., the Federalsburg[2] Police Department intervened in

---

1. Section 10–201(c)(3) of the Criminal Law Article states that, "[a] person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace." Maryland Code (2002), Section 10–201(c)(3) of the Criminal Law Article.

2. Federalsburg is a small municipality, with a population of approximately 2,620, on Maryland's Eastern Shore, located on the Marshyhope

several disputes in progress, all resulting from an argument between Alexander Wilcox and Derrick Wilcox.[3] Officer Pennell Jester observed the two squabbling near Academy Avenue in Federalsburg, and requested backup. When Officer Brian McNeill responded, both officers approached, and the Wilcoxes left the area.

The quarrel migrated to a nearby street corner where a large crowd began to gather. According to Officer Jester, "there was a lot of heated activity at the corner," which "appeared to be we're gonna get somebody or something was going to be happening." Both police officers interceded and ordered the crowd to disperse.

Over the next ten minutes, the group gradually scattered, and the officers followed both Wilcoxes to the Lucky Corner Store. After leaving the store, another confrontation began among the Wilcoxes and two other individuals. Officer Jester testified that "it looked like there was gonna be a fight again," and both officers separated the four men. By that time, a larger crowd of eight to ten people had gathered. The officers again ordered the gathering to disperse.

A larger throng, between twenty and thirty people, began to gather at a nearby street corner. The participants shouted and were loud as they walked throughout traffic. Officers Jester and McNeill again approached and moved the participants out of traffic and away from the street corner.

The conflagration continued to migrate to a nearby parking lot. Officer Jester testified that "it appeared that there was going to be an immediate altercation [with] . . . a whole bunch of people just acting completely out of control," and that he "thought a riot was ensuing" because "there was enough people there" and it "was getting way out of control, way too

Creek in the southern-most part of Caroline County. *Maryland Manual On–Line* (2006), available at http://www.msa.md.gov/msa/ mdmanual/html/mmtoc.html (last visited Jan. 8, 2007).

3. The record does not reflect any familial relationship between the two Wilcoxes.

fast." Officers Jester and McNeill intervened, interposed themselves within the crowd, and, to no avail, ordered the participants to disperse. Over time, eventually the maelstrom died down, and the crowd dissipated.

Around 7:20 p.m., the next altercation occurred, this time at the Garden Court Apartments. Officers Jester and McNeill were dispatched to the scene after the Caroline County Sheriff's Department received a 911 call regarding a fight between forty and sixty people. When they arrived, Officer Jester determined that the argument was over, but that numerous people, including Spry, were loitering at the location. The situation was "very heated," and along with Officers McNeill, Wielgosz, and Adams, and Deputy Sheriff Gestole, Officer Jester ordered those present to immediately leave the location if they did not live in the Garden Court Apartments. Officer Jester testified that he ordered the crowd to depart the area because there were "forty to fifty people standing in the middle of the roadway and the parking lot, screaming, yelling loud, [and] carrying on. . . ."

Spry, who was not a resident of the Garden Court Apartments,[4] refused to leave. What happened next was the subject of the following testimony of Officer Jester:

[T]hat's where Mr. Spry became involved in the incident. He was in the apartments there, he's not a resident of those apartments. He was advised by myself to move along, and Mr. Spry right in my face, looked at me and said, "Fuck you bitch." He continued to stand in front of me defiantly refusing to move and to leave the area.

\* \* \*

He stood his ground firmly, like he's not going anywhere. . . .

\* \* \*

---

**4.** Spry acknowledged in his testimony that, at the time, he was not a resident of the Garden Court Apartments, but that he was visiting family. Officer Jester also testified that he knew Spry was not a resident of the Garden Court Apartments.

Mr. Spry refused to move. Again I advised Mr. Spry it was time to move along which he responded with to me, with more profanity. Mr. Spry continued to, what we called eyeball, just glare at me, like he was looking through me.

Officer Jester then ordered Spry to move along "at least four or five times" within the space of five to ten minutes.

Officer McNeill testified similarly about the interaction at the Garden Courts Apartment complex, noting that there were many individuals, including Spry, who were menacing, shouting obscenities at the officers, and creating a disturbance:

Mr. George Spry was yelling numerous profanities at officers, and as Officer Jester walked to Mr. Spry's location they were like in a Mexican stand off. Mr. Spry was standing in, it appeared a defiant stance to Officer Jester. . . .

* * *

His jaw was clenched, he was standing with his arms down by his side, his left fist appeared to be balled; it was completely balled, it was just curled up forming more of a balled fist looking, as opposed to an open relaxed hand. And as Officer Jester continued to approach him, Mr. Spry stood still, stood at the same position where he was at. I then began to walk towards Officer Jester and Mr. Spry's location, at that point and time some associates of Mr. Spry began tugging at him, saying, come on George, let's go. And Mr. Spry then walked away, along with his associates continuing to yell profanities back at the police.

* * *

I heard Officer Jester direct Mr. Spry to leave the area, as he was telling other individuals. . . . After each directive from Officer Jester, Mr. Spry made a comment like, fuck the police, nobody's scared of you fucking cops, or something like fuck you all. I just kept hearing the word fuck come out of his mouth.

In response to a question about the volume of Spry's invocations, Officer McNeill replied that the volume of his voice was "elevated, he projected throughout the . . . immediate area where we responded to."

Officer Jester filed a statement of charges during the afternoon of the following day, formally charging Spry with one count of riot, one count of obstructing and hindering a police officer, one count of failing to obey a lawful order that a law enforcement officer makes to prevent a disturbance to the public peace in violation of Section 10–201(c)(3) of the Criminal Law Article; one count of disturbing the peace in violation of Section 10–201(c)(4) of the Criminal Law Article;[5] one count of disturbing the peace by making an unreasonably loud noise in violation of Section 10–201(c)(5) of the Criminal Law Article;[6] one count of disturbing the peace by hindering the free passage of another in violation of Section 10–201(c)(1) of the Criminal Law Article;[7] and one count of disorderly conduct in violation of Section 10–201(c)(2) of the Criminal Law Article.[8] Spry was arrested pursuant to a warrant on April 21, 2004.[9]

---

**5.** Section 10–201(c)(4) of the Criminal Law Article provides that "[a] person who enters the land or premises of another, whether an owner or lessee, or a beach adjacent to residential riparian property, may not willfully: (i) disturb the peace of persons on the land, premises, or beach by making an unreasonably loud noise; or (ii) act in a disorderly manner." Maryland Code (2002), Section 10–201(c)(4) of the Criminal Law Article.

**6.** Section 10–201(c)(5) of the Criminal Law Article declares that, "[a] person from any location may not, by making an unreasonably loud noise, willfully disturb the peace of another; (i) on the other's land or premises; (ii) in a public place; or (iii) on a public conveyance." Maryland Code (2002), Section 10–201(c)(5) of the Criminal Law Article.

**7.** Section 10–201(c)(1) of the Criminal Law Article requires that, "[a] person may not willfully and without lawful purpose obstruct or hinder the free passage of another in a public place or on a public conveyance." Maryland Code (2002), Section 10–201(c)(1) of the Criminal Law Article.

**8.** Section 10–201(c)(2) of the Criminal Law Article mandates that, "[a] person may not willfully act in a disorderly manner that disturbs the public peace." Maryland Code (2002), Section 10–201(c)(2) of the Criminal Law Article.

**9.** The application for an arrest warrant against Spry was based on the affidavit of Officer Jester recounting the facts presented above. Officer Jester averred in his affidavit that:

Spry requested a jury trial on June 28, 2004, and the case was removed to the Circuit Court for Caroline County. On September 24, 2004, the first day of trial, the State nolle prossed the charges for riot, disturbing the peace, and disturbing the peace by making an unreasonably loud noise. After the State rested, Spry's counsel moved for judgment of acquittal on the four remaining charges, which was granted as to the charges for disturbing the peace by hindering the free passage of another and obstructing and hindering a police officer, as well as for the disorderly conduct charge. Spry was convicted by a jury on the only remaining count, failing to obey a lawful order that a law enforcement officer makes to prevent a disturbance to the public peace in violation of Section 10–201(c)(3). Spry was sentenced to sixty days imprisonment with all but two consecutive weekends suspended, as well as one year of unsupervised probation.[10]

Spry noted an appeal to the Court of Special Appeals, contending that the evidence was not legally sufficient to support his conviction, and posing one question of "whether tardy compliance is violation of the statute."[11] In an unre-

___

This officer was and other [Federalsburg Police Department] officers were dispatched by [the Caroline County Sheriff's Department] to the [Garden Court Apartments] in reference to a large fight in progress. Upon arrival this officer observed a large crowd and attempted to disperse the crowd which the defendant was part of. The defendant was loud and disorderly and was ordered by this officer to disburse, to which the defendant advised this officer "Fuck you bitch" and refused to leave the area while taking an aggressive stance with this officer and glaring at this officer defiantly. The defendant was again ordered to leave the area and continued to use profanity at police within hearing distance of residents of the Garden Apartments. The defendant's actions incited others to become disorderly and caused officers to have to focus their attention at disbursing more disorderly persons in the area. The defendant continued to be disorderly using profanity and challenging this officer to a confrontation.

10. Section 10–201(d) provides that "[a] person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 60 days or a fine not exceeding $500 or both." Maryland Code (2002), Section 10–201(d) of the Criminal Law Article.

11. Spry was joined in his appeal by Menyonne Fletcher and Shavonne Parker, who had been convicted of both failure to obey a police officer's

ported opinion, the intermediate appellate court characterized the incidents in Federalsburg on the evening of April 19th, 2004, as a three-round scuffle, "riotous," and almost reducing "the peace and tranquility ... to a civil war battlefield," and described Spry as a "leading voice of defiance," and "truculent." In affirming his conviction and finding that the evidence was sufficient to convict, the appellate court determined that "the question is where on the intervening continuum to place the critical point where Section 10–201(c)(3) is violated," a question "entrusted to the collective wisdom of our judicial fact finders." The court also stated that "a snarling compliance twenty minutes after an order is given does not negate nineteen antecedent minutes of non-compliance."

We granted Spry's petition for writ of certiorari, which presented the following question for our review:

Was Petitioner improperly convicted of failing to obey a police order to leave the scene when he did leave and there was no attempt to arrest him when the order was given?

*Spry v. State,* 393 Md. 477, 903 A.2d 416 (2006). We hold that a police officer does not have to arrest an individual immediately after the first disobedience of a lawful order made to prevent a disturbance to the peace, nor does a police officer have to arrest the individual at the scene.

## II. Discussion

Spry contends that he was improperly convicted for failure to obey Officer Jester's order to leave the scene in violation of Section 10–201(c)(3) because arrest is an element of the offense, such that he must have been arrested at the scene, when he first disobeyed the police order. Spry also argues that, because he eventually did leave the Garden Court Apartments, he complied with Officer Jester's order, so that there is not sufficient evidence to sustain his conviction.

reasonable order and disorderly conduct. Neither Fletcher nor Parker filed a petition for a writ of certiorari to this Court.

The State, conversely, argues that there was sufficient evidence to support Spry's conviction for failure to obey Officer Jester's order to leave the scene because Spry failed to obey Officer Jester's order which had to be repeated four or five times. The State also maintains that police are not required to arrest for violations of Section 10–201(c)(3) immediately after the first disobedience of a lawful police order, or at the scene.

Spry argues that a law enforcement officer must arrest an individual who violates Section 10–201(c)(3) at the scene in order to enforce the statute, and immediately after the first disobedience. Although the violation of Section 10–201(c)(3), a misdemeanor, occurred in the presence of Officer Jester, Spry was not arrested until after Officer Jester secured a warrant on the following day. Effectively, Spry contends that, because the arrest was not made at the scene, and immediately after the first disobedience, police lost the ability to arrest him for a violation of Section 10–201(c)(3).

The relevant portion of Section 10–201 of the Criminal Law Article provides that "[a] person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace." Maryland Code (2002), Section 10–201(c)(3) of the Criminal Law Article. This Section codifies one aspect of the common law crimes of disorderly conduct and breach of the peace.[12]

---

12. The first statutory enactment of the crime for failure to obey a lawful order that a law enforcement officer makes to prevent a disturbance to the public peace occurred in 1998, when Senate Bill 390 codified the crime within Section 121(b)(3), Article 27. 1998 Md. Laws, Chap. 383. A Committee Note from the Committee to Revise Article 27 was included within Senate Bill 390, indicating that the provision was "intended to codify the common law on failure to obey the lawful order of a police officer." Senate Bill 390 (1998), Committee Note, Committee to Revise Article 27. See also Senate Judicial Proceedings Committee, Bill Analysis, Senate Bill 390 (1998) (stating that "the offense of failing to obey the lawful order of a law enforcement officer made to prevent a disturbance to the public peace as constituting disorderly conduct is not codified, and is only found in case law," and providing the example of *Harris v. State,* 237 Md. 299, 206 A.2d 254 (1965)). Article 27, Section 121(b)(3) was recodified in 2002, without substan-

Our jurisprudence has not included arrest as an element of the offenses of disorderly conduct and breach of the peace. Rather, in *Wanzer v. State*, 202 Md. 601, 97 A.2d 914 (1953), this Court interpreted what constitutes a breach of the peace, noting that it signifies disorderly, dangerous conduct, "an affray, actual violence, or conduct tending to or provocative of violence by others." *Id.* at 609, 97 A.2d at 918. In *Drews v. State*, 224 Md. 186, 167 A.2d 341 (1961), we noted that, while disorderly conduct offenses are presently codified in Section 10–201 of the Criminal Law Article,[13] "[t]he gist of the crime

---

tive change, as Section 10–201(c)(3) of the Criminal Law Article. 2002 Md. Laws, Chap. 26, Section 2.

**13.** Disorderly conduct offenses are codified in Section 10–201 of the Criminal Law Article, which provides:

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2)(i) "Public conveyance" means a conveyance to which the public or a portion of the public has access to and a right to use for transportation.

(ii) "Public conveyance" includes an airplane, vessel, bus, railway car, school vehicle, and subway car.

(3)(i) "Public place" means a place to which the public or a portion of the public has access and a right to resort for business, dwelling, entertainment, or other lawful purpose.

(ii) "Public place" includes: 1. a restaurant, shop, shopping center, store, tavern, or other place of business; 2. a public building 3. a public parking lot; 4. a public street, sidewalk, or right-of-way; 5. a public park or other public grounds; 6. the common areas of a building containing four or more separate dwelling units, including a corridor, elevator, lobby, and stairwell; 7. a hotel or motel; 8. a place used for public resort or amusement, including an amusement park, golf course, race track, sports arena, swimming pool, and theater; 9. an institution of elementary, secondary, or higher education; 10. a place of public worship; 11. a place or building used for entering or exiting a public conveyance, including an airport terminal, bus station, dock, railway station, subway station, and wharf; and 12. the parking areas, sidewalks, and other grounds and structures that are part of a public place.

(b) *Construction of section.*—For purposes of a prosecution under this section, a public conveyance or a public place need not be devoted solely to public use.

(c) *Prohibited.*—(1) A person may not willfully and without lawful purpose obstruct or hinder the free passage of another in a public place or on a public conveyance.

of disorderly conduct . . . as it was in the cases of common law predecessor crimes, is the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area." *Id.* at 192, 167 A.2d at 343–44. *See Sharpe v. State,* 231 Md. 401, 404, 190 A.2d 628, 630 (1963).

Likewise, we have never held that arrest is an element of what was defined specifically as the failure to obey a police officer's lawful command, another type of disorderly conduct. In *Drews, supra,* this Court addressed the sufficiency of evidence for the conviction of a group of individuals for refusing to leave an amusement park after being asked to do so several times by park employees and police, who feared that the increasingly inhospitable crowd would erupt into a mob; we stated:

> [I]t has been held that failure to obey a policeman's command to move on when not to do so may endanger the public peace, amounts to disorderly conduct. . . . [R]efusal to obey an order of a police officer, not exceeding his authority, to move on "even though conscientious . . . may interfere with the public order and lead to a breach of the

---

(2) A person may not willfully act in a disorderly manner that disturbs the public peace.

(3) A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace.

(4) A person who enters the land or premises of another, whether an owner or lessee, or a beach adjacent to residential riparian property, may not willfully: (i) disturb the peace of persons on the land, premises, or beach by making an unreasonably loud noise; or (ii) act in a disorderly manner.

(5) A person from any location may not, by making an unreasonably loud noise, willfully disturb the peace of another; (i) on the other's land or premises; (ii) in a public place; or (iii) on a public conveyance.

(6) In Worcester County, a person may not build a bonfire or allow a bonfire to burn on a beach or other property between 1 a.m. and 5 a.m.

(d) *Penalty.*—A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 60 days or a fine not exceeding $500 or both.

Md.Code (2002), Section 10–201 of the Criminal Law Article.

peace," and that such a refusal "can be justified only where the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order."

224 Md. at 192–93, 167 A.2d at 344, quoting *People v. Galpern,* 259 N.Y. 279, 181 N.E. 572, 574 (1932) (citations omitted). *See Polk v. State,* 378 Md. 1, 21, 835 A.2d 575, 587 (2003); *Dennis v. State,* 342 Md. 196, 201, 674 A.2d 928, 930 (1996); *Sharpe,* 231 Md. at 404, 190 A.2d at 630; *Harris,* 237 Md. at 303, 206 A.2d at 256.

Concomitantly, we have never held that a person must be arrested after the first disobedience rather than after repeated refusal to move in order for a conviction to be sustained. Rather, we have affirmed convictions for failing to abide by a police officer's lawful order even though the individual was issued multiple orders and was not arrested immediately after the first order was disobeyed. *See Polk,* 378 Md. at 17–18, 835 A.2d at 585 (sustaining conviction for violation of disorderly conduct statute after refusal to abide by four or five police orders to remain quiet and leave premises); *Drews,* 224 Md. at 193, 167 A.2d at 344 (upholding conviction of a group of individuals for disorderly conduct for refusing to follow multiple orders to leave an amusement park).

Spry argues, nonetheless, that police are required to arrest for a violation of Section 10–201(c)(3) immediately after the first disobedience, because otherwise, the violator's actions must be construed as compliance with the order. In asserting this, however, the emphasis is on the wrong actor—it is the police officer who retains the discretion to affect an arrest. We have iterated that the decision to arrest is an important "discretionary judgmental power granted to a police officer," and one that is "basic to the police power function of government[ ] ... and ... critical to a law enforcement officer's ability to carry out his duties." *Ashburn v. Anne Arundel County,* 306 Md. 617, 633, 510 A.2d 1078, 1086 (1986), quoting *Everton v. Willard,* 468 So.2d 936, 938 (Fla.1985).

The discretionary aspect of a law enforcement officer's authority when arresting without a warrant at the scene of a misdemeanor, such as in the present case, is limited ordinarily only by a need for the arrest to be effectuated in "due time." In *Childress v. State*, 227 Md. 41, 175 A.2d 18 (1961), we analyzed the validity of a warrantless arrest for disorderly conduct made as the defendant was leaving the scene, when the defendant had been observed by a police officer directing traffic near a busy intersection during rush hour and causing "considerable confusion and some rather minor bumps." *Id.* at 42, 175 A.2d at 19. When the officer attempted to arrest Childress, he left the scene and entered a nearby rooming house where he was arrested. We acknowledged that where a misdemeanor is committed in the presence of a law enforcement officer, a *warrantless* arrest must be made within "due time" of the offense, but affirmed defendant's conviction because the arrest was made "almost at once." *Id.* at 43, 175 A.2d at 19. *See also Gattus v. State*, 204 Md. 589, 600–01, 105 A.2d 661, 666 (1954) ("There is another common law doctrine of fresh pursuit whereby a peace officer may arrest, without a warrant, for misdemeanors committed in his presence within a reasonable time thereafter. The fresh pursuit affects only the reasonableness of the lapse of time between the commission of the offense and the arrest thereof."). *Cf. Torres v. State*, 147 Md.App. 83, 98, 807 A.2d 780, 789 (2002) (finding that delay of thirteen days between misdemeanor committed in the presence of a law enforcement officer and warrantless arrest did not comply with the "reasonable promptness rule").[14]

---

14. Other courts have utilized similar criterion to determine whether a warrantless arrest was reasonable because of the time lapse between the misdemeanor violation and its subsequent arrest. In *Commonwealth v. Howe*, 405 Mass. 332, 540 N.E.2d 677 (1989), the Supreme Judicial Court of Massachusetts considered the authority of a deputy sheriff to arrest a person without a warrant for operating a motor vehicle under the influence of alcohol, a misdemeanor. The court answered the question in the affirmative, noting that a warrantless arrest is appropriate because the offense "is still continuing at the time of the arrest or only interrupted, so that the offense and the arrest form parts of one transaction." *Id.* at 678. *Cf. State v. Warren*, 103 N.M. 472, 709 P.2d 194, 200 (Ct.App.1985) (holding that a two and one half

In the present case, Officer Jester arrested Spry two days after the violation, which may or may not have implicated the issue of delay had the arrest been without a warrant. Spry's arrest, however, occurred after a warrant had been secured.

■ We have recognized, as has the Supreme Court, that arrests with warrants provide safeguards for putative defendants by allowing "a neutral judicial officer to assess whether the police have probable cause to make an arrest...." *Steagald v. United States,* 451 U.S. 204, 212, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38, 46 (1981). *See Greenstreet v. State,* 392 Md. 652, 668, 898 A.2d 961, 971 (2006) (noting that there is a "strong preference for warrants" because a decision by a neutral magistrate "is a more reliable safeguard ... than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime' "), quoting *United States v. Leon,* 468 U.S. 897, 913–14, 104 S.Ct. 3405, 3415–16, 82 L.Ed.2d 677, 692–93 (1984). A warrant is a "checkpoint between the Government and the citizen ... to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty...." *Steagald,* 451 U.S. at 212, 101 S.Ct. at 1648, 68 L.Ed.2d at 46.

Spry, nevertheless, asserts that Officer Jester, as well as any other officer at the scene, lost his ability to effectuate the arrest when the officer submitted his observations to judicial review and secured a warrant after the melee in Federalsburg ended. He, however, alleges no actual prejudice occurring to him on account of the two-day delay between the occurrence of the offense and the time that he was arrested with a warrant which could implicate due process, as we have heretofore recognized in *Clark v. State,* 364 Md. 611, 774 A.2d 1136 (2001):

---

hour delay in executing a warrantless arrest for drinking in public, a misdemeanor, was unreasonable because the officer delayed in making the arrest "for purposes disassociated with the arrest ... [and] for such a length of time as to necessarily indicate the interposition of other purposes").

[A]bsent a showing of actual prejudice, compared to possible prejudice, "the applicable statute of limitations ... is usually considered the primary guarantee against bringing overly stale criminal charges." ... Where a defendant can demonstrate actual prejudice, however, in circumstances where the delay between the occurrence of the criminal offense and the date of arrest ... is unduly long and the actions of the State in delaying were unreasonable, deliberate and oppressive, the due process clause would demand a dismissal....

*Id.* at 645 n. 25, 774 A.2d at 1156 n. 25, quoting *Dorsey v. State*, 34 Md.App. 525, 537–38, 368 A.2d 1036, 1044 (1977).

It would be illogical and unreasonable to limit the discretion of the officers in the present case by the adoption of Spry's stance just because the officers secured an arrest warrant after the conflagration ended. When confronted with other substantial concerns such as when a disturbance to the public peace has occurred, or when a riot or more serious situation is looming, police reasonably focus on quelling the disturbance, rather than formally arresting each perpetrator immediately. The discretion to do so, especially when thereafter the officer secures an arrest warrant, should not be circumvented.

In the present case, Officer Jester, after a tumultuous series of events, arrived at the Garden Court Apartments on April 19, 2004, during a volatile and heated situation with "forty to fifty people standing in the middle of the roadway and parking lot, screaming, yelling ... [and] carrying on." To squelch the disturbance, he ordered those present, who did not live at the Garden Court Apartments, to disperse, which included Spry. Instead, Spry refused to leave, acted menacingly and loudly. Although Spry eventually left, it was at the insistence of a colleague and after Officer Jester had repeated his order at least four or five times. Spry's noncompliance until that point is not negated by his eventual and untimely decision to leave.

Thus, we affirm the decision of the Court of Special Appeals.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS*
*AFFIRMED WITH COSTS.*

BELL, C.J., dissents and files an opinion.

BELL, Chief Judge, dissenting.

George Junior Spry, the petitioner, was a part of a gathering of approximately forty to fifty people gathered at the Garden Court Apartments in Federalsburg, who, according to the police, in the aftermath of a fight or an argument, were loitering, "standing in the middle of the roadway and the parking lot, screaming, yelling loud, carrying on...." The police ordered the crowd to disperse, an order that many in the crowd, including the petitioner, did not immediately heed. The petitioner's refusal apparently caught the police's attention, especially because it was not a silent refusal or a dawdling, gradual refusal. It was, instead, an emphatic and vocal one. As described, and emphasized, by Officer Jester, one of the police officers on the scene and the arresting officer, "[h]e stood his ground firmly, like he's not going anywhere," standing in front of him, eyeballing him, glaring at him, "like he was looking through [him]," "defiantly refusing to move and to leave the area," and his adamance was punctuated and emphasized by profanity, especially the word, "fuck": "Fuck you bitch," "fuck the police, nobody's scared of you fucking cops or something like fuck you all." Despite his defiance and adamance about not leaving, after being ordered to do so four or five times over a five to ten minute time span, the petitioner left the area, thus complying with the police order. That was not the end of the matter, however.

The following day, the police obtained a warrant charging the petitioner with, *inter alia*,[1] willful failure to obey a lawful order of a law enforcement officer made to prevent a distur-

---

1. The petitioner also was charged with riot, obstructing and hindering a police officer, disorderly conduct, Maryland Code (2002) § 10–201(c)(2), and a number of disturbing the peace offenses: §§ 10–201(c)(1); 10–201(c)(4); 10–201(c)(5). He was either acquitted or the State nolle prossed each of these offenses.

bance of the peace, pursuant to Maryland Code (2002) § 10–201(c)(3) of the Criminal Law Article.[2] The petitioner was convicted of that offense after a jury trial and sentenced. In sending the case to the jury, the trial court opined: "a snarling compliance twenty minutes after an order is given does not negate nineteen antecedent minutes of non-compliance." In affirming the conviction, the majority makes a similar statement:

> "To squelch the disturbance, [the officer] ordered those present, who did not live at the Garden Court Apartments, to disperse, which included Spry. Instead, Spry refused to leave, acted menacingly and loudly. Although Spry eventually left, it was at the insistence of a colleague and after Officer Jester had repeated his order at least four or five times. Spry's noncompliance until that point is not negated by his eventual and untimely decision to leave."

*Spry v. State*, 396 Md. 682, 696, 914 A.2d 1182, 1190 (2007).

The offense of which the petitioner was convicted is willfully failing to obey a law enforcement officer's reasonable and lawful order made to prevent a disturbance to the public peace. Because the object of the statute is the prevention of a disturbance of the public peace, when the arrest is made the threat to the public peace must yet exist, and the willful failure to obey the order made in pursuance of abating it must also persist. Under this statute, there is no offense committed if the defendant complies and if there is no threat to the public peace. Here, the petitioner complied with the officer's order, albeit quite belatedly. The statute does not provide a temporal or numerical standard by which a defendant's refusal or compliance is be judged. Nor is there a provision requiring that the compliance be cheerful, willful or even the opposite of "snarling," or that it must be the defendant's alone; a third person's persuasive influence on a defendant is not singled out

---

**2.** Maryland Code (2002) § 10–201(c)(3) of the Criminal Law Article provides: "A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace."

as a factor to be discounted when a defendant is tardy complying with the order to leave the area, but leaves on that third person's "insistence." The fact is that when a defendant leaves, even if after multiple orders from the police, and even if at the insistence of a friend or done grudgingly or cheerfully, the defendant complies with the order and the threat to the public peace is abated.[3]

The majority rejects this common sense approach, suggesting that whether to arrest, and when, is matter of the police officer's discretion.[4] That discretion, it reminds us, "is 'basic to the police power function of government[ ] . . . and . . . critical to a law enforcement officer's ability to carry out his duties.' " 396 Md. at 693, 914 A.2d at 1189, *quoting Ashburn v. Anne Arundel County,* 306 Md. 617, 633, 510 A.2d 1078, 1086 (1986), *quoting Everton v. Willard,* 468 So.2d 936, 938 (Fla.1985). I do not disagree with the proposition that discretion to arrest is critical to the police function. I do not agree, however, that the issue is presented in this case. It simply does not apply where the conduct that constitutes the offense consists of the defendant's failure to respond to a police order. The police have the authority, discretion, to arrest so long as the defendant's conduct and their order are at variance—so

---

**3.** The statute is clear in its requirements, a police order, reasonable and lawful, aimed at preventing a disturbance of the public peace and a willful failure to comply with that order. To reach the result the majority does, one has to read into the statute a further requirement, that there can be gradations of willful refusal and, if not a temporal factor, an officer tolerance one. This would suggest that the statute is ambiguous. Ambiguity, however, implicates the rule of lenity, the result of which is an interpretation favorable to the petitioner.

**4.** The majority cites, in support of its assertion that "we have never held that a person must be arrested after the first disobedience rather than after repeated refusal to move in order for a conviction to be sustained," 396 Md. at 693, 914 A.2d at 1188, *Polk v. State,* 378 Md. 1, 17–18, 835 A.2d 575, 585 (2003); *Drews v. State,* 224 Md. 186, 193, 167 A.2d 341, 344 (1961). That may be so, but it also is true that, until today, we had not held that a person who ultimately complied with a police order after multiple failures to do so, could be charged under § 10–201(c)(3). Today's holding certainly does not follow from *Polk* and *Drews.* In both those cases, the conduct was on-going; it had not ceased.

long as the defendant does not conform his conduct to that the police require. When, however, the defendant conforms his conduct to what is being required by the police there really is no longer any discretion, there being no longer any offense to be violated.

It may well be that, during his refusal and perhaps the refusal itself, the petitioner may have committed some other criminal offense—he was charged with, but acquitted of, several—that, however, is not an issue to be decided here. A § 10–201(c)(3) conviction will not lie, and should not lie, to vindicate the officer's apprehension or dignity. What is quite evident on this record is the exception that the police took to the language that the petitioner used in stating his refusal to leave and the attitude, lack of respect, if you will, for the officers, rather than for authority, that he displayed toward them. The use of profanity and the failure to show what an officer may regard as proper respect are not the elements of the offense with which the petitioner was charged and, consequently, can not, and should not, be the basis for his conviction.

I dissent.