995 A.2d 812

Isaac LIVINGSTON

v.

STATE of Maryland.

No. 1669 Sept.Term, 2008.

Court of Special Appeals of Maryland.

May 27, 2010.

554

Piedad Gomez (Paul B. DeWolfe, on the brief), Baltimore, MD, for Appellant.

Mary Ann Ince (Douglas F. Gansler, on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, KEHOE and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

Title 18 of the Maryland Health–General Code governs "Disease Prevention." Md.Code (2009 Repl.Vol.), §§ 18–101 to 18–1002 of the Health–General Article ("H–G"). Subtitle 3 applies to specific diseases, one of which (at Part IV) is tuberculosis. H–G section 18–324, entitled "Control of communicable tuberculosis," authorizes the Secretary of Health and Mental Hygiene ("Secretary") or a health officer to have a person examined for tuberculosis upon learning that the person is suspected of having tuberculosis; and that, upon a finding that the person has tuberculosis and the person's condition endangers or may endanger the public, to "order the individual to receive appropriate medical care." H–G §§ 18–324(a) and (b)(1).[1]

---

1. A health officer "means, unless expressly provided otherwise, the Baltimore City Commissioner of Health or the health officer of a county." H–G § 1–101(c).

H–G section 18–325 prohibits the following acts by people suffering from communicable tuberculosis:

(a) *Refusal to enter health facility.*—An individual may not refuse to comply with the placement ordered under § 18–324 of this subtitle.

(b) *Disorderly behavior; leaving before proper discharge.*—While an individual is in any placement for tuberculosis treatment, the individual may not:

(1) Behave in a disorderly manner; or

(2) Leave the placement before being discharged properly.

The statute also criminalizes those acts and imposes penalties:

(c) *Penalty.*—An individual who violates any provision of this section is guilty of a misdemeanor and on conviction shall be imprisoned in a penal institution with facilities for tuberculosis treatment until the Secretary or the Health Department of Baltimore City finds that the condition of the individual no longer endangers the health of the community, or the Secretary obtains a court order that states that the individual:

(1) Is to be moved to a specified less restrictive setting for continuation of treatment;

(2) Must comply with the treatment until the Secretary determines the treatment has been completed;

(3) May not behave in a disorderly manner or leave the placement until the Secretary determines that the individual has completed the treatment; and

(4) Following a hearing, will be reimprisoned until the Secretary determines that the individual has completed the treatment, if the individual does not comply with the terms of the order.

In the Circuit Court for Wicomico County, Isaac Livingston, the appellant, was convicted in a bench trial of one count of refusing to comply with a placement order issued by the Secretary, in violation of H–G section 18–325(a), and one count of behaving in a disorderly manner while in a placement for

tuberculosis treatment, in violation of H–G section 18–325(b)(1). He was sentenced to a penal facility for the treatment of tuberculosis until the Secretary either determined that his condition no longer endangered the health of the community or obtained a court order consistent with H–G section 18–325(c).[2]

On appeal, Livingston presents two issues for review, which we have reworded and reordered as follows:

I. Did the trial court err in ruling that H–G section 18–325(b)(1) is not unconstitutionally vague?

II. Was the evidence legally sufficient to sustain Livingston's convictions? [3]

For the following reasons, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

Livingston, age 52 at the relevant time, was diagnosed with tuberculosis while living in Augusta, Georgia. He relocated to Prince George's County, Maryland, for the purpose of securing better medical care. Following his arrival, the Secretary

---

**2.** We take judicial notice of the fact that on December 9, 2009, the circuit court issued an order for Livingston's release from custody effective December 11, 2009.

**3.** Livingston was charged and tried on two additional counts (both for leaving a placement for tuberculosis treatment before being discharged properly) and was acquitted. In his opening brief, he included questions presented that challenged the admission of certain evidence pertinent to one of those counts and the legal sufficiency of the evidence supporting one of those counts. The State responded to those questions by pointing out that Livingston was not aggrieved by any of the rulings they involved as he was not convicted on the pertinent counts. In his reply brief, Livingston withdrew his challenge to the admission of evidence supporting one of those counts and limited his sufficiency challenge to the counts on which he was convicted.

Livingston's phrasing of the remaining question presented was as follows:

3. Whether § 18–325 of the Health General Article, which provides for imprisonment in a penal institution upon conviction for "behaving in a disorderly manner" at a placement for tuberculosis treatment, is unconstitutionally vague?

issued an order directing him to be placed at Deer's Head Hospital ("the hospital") in Wicomico County for tuberculosis treatment. The order was issued on February 4, 2008.

Livingston drove himself to the hospital on the evening of February 5, 2008. He was assigned to an isolation room. The isolation room opened to an anteroom where hospital staff would put on their gowns and protective hoods or masks before entering Livingston's room.

Rebecca Gravenor, a registered nurse and "infection control practitioner" at the hospital, testified that, on February 7, 2008, she spoke to Livingston about the required procedures at the hospital and advised him that he had to wear a mask whenever he left his room to go into the anteroom or the hallway. According to Gravenor, the purpose of wearing the mask was "[t]o prevent large droplet spray from the patient," because coughing, speaking, yelling, singing, and breathing all can force tuberculosis bacteria into the air and cause the disease to spread. Initially, Livingston was allowed to go outside the hospital building onto the hospital grounds, which included a dock where he could sit without wearing a mask so long as no one was within 50 feet of him. Gravenor explained that fresh air is good for tuberculosis patients, and that the "TB germ dies in sunlight."

A few days after Livingston arrived at the hospital, Gravenor observed him standing beside his car in the hospital parking lot. He was not wearing a mask and other people had walked within 20 feet of him. When she and other hospital employees approached Livingston, he put his mask on.

On February 15, 2008, Livingston's grounds privileges were revoked and he was required to stay in his room. A sign was placed on the outside of the door to Livingston's room warning that "this patient is not to leave this room for any reason." On one occasion after Livingston's grounds privileges had been revoked, Gravenor entered the anteroom and, before she could put on the protective equipment, Livingston opened the door between his room and the anteroom. When she asked

him to return to his room until she had donned her protective equipment, he complied.

Barbara Rolf, a nurse who regularly worked from 11:00 p.m. to 7:00 a.m., testified that Livingston occasionally came out of his room without a mask on, entered the anteroom, and looked out a window in the anteroom. She never saw Livingston outside the anteroom without a mask. While Livingston was at the hospital, Rolf frequently spoke with him because he was "awake a lot at night." On March 5, 2008, Livingston told her, "I need to get out of here or I will be in the pen or I will hurt someone."

Amanda Insley worked as a charge nurse at the hospital. She testified that on March 10, 2008, as she was entering the hospital building to begin work at 7:00 a.m., she observed Livingston and a hospital staff member standing near Livingston's parked car. Livingston was about a foot away from Insley. The hospital staff member was wearing a protective mask, but Livingston was not. Insley reported the incident to a supervisor.

Portia Mathews also worked as a nurse at the hospital. On March 15, 2008, she spoke with Livingston about leaving his hospital room. Livingston told her that "he was under the assumption that he could leave the unit" at night because there were less people around. Mathews told him that he could not, and that he had to stay in isolation in his room. Livingston responded that he would not leave again. About two days later, Mathews observed Livingston enter the anteroom without wearing a mask.

On March 19, 2008, Mathews worked from 3:00 p.m. to 11:00 p.m. When she left the hospital building at about 11:30 p.m., she saw Livingston's vehicle parked about four spaces from the hospital entrance. The next morning, she noticed that Livingston's vehicle had been moved. She did not see Livingston driving his vehicle, however. Upon entering the hospital, Mathews went to Livingston's room. There she saw a Tiger Mart coffee cup with coffee in it.

Mathews acknowledged that she never saw a list outlining what Livingston could and could not do while at the hospital. She testified that the infection control nurse educates patients about tuberculosis isolation guidelines.

Jeanne Abbott, a nursing assistant, testified that, on Livingston's second day in the hospital, a nurse gave her and another nursing assistant a mask and asked them to go outside and give it to Livingston, tell him he could not be outside without it, and ask him to return to his room. Abbott testified:

> We found [Livingston] out in his vehicle in the parking lot. We went out there to tell him and he cursed at us. He said he knew he was supposed to have a mask and he had one there but since he was outside he wasn't putting it on. In fact, he didn't wear it out, he didn't have it in there, so we gave him another one and instructed him that he had to put this on and he needed to go back to his room. He flatly refused and cursed at us and we went back in to instruct the charge nurse as to what had happened. And they called security.

Abbott also testified that on March 16, 2008, she went to Livingston's room in response to a call bell. She looked in a window to the anteroom and did not see anyone. When she pushed the door open, however, Livingston "was right there in [her] face," without a mask on.

Another nursing assistant at the hospital, Megan Towers, testified that on March 16, 2008, while she was working the 11:00 p.m. to 5:00 a.m. shift, she responded to Livingston's call bell. When she entered the anteroom, Livingston was there with his mask around his neck. She asked him to put on his mask and she quickly stepped out of the anteroom. After Livingston put on his mask, Towers reentered the anteroom. Livingston told her he had a rash on his neck and the nurse was supposed to put Benadryl on it. Towers told Livingston she would contact a nurse for him, which she did, but the nurse was involved in "a situation down the hall."

About a half hour to 45 minutes later, Livingston rang his call bell again. When Towers responded, Livingston wanted

to know where the nurse was. She told him the nurse was busy with another situation. According to Towers, Livingston "stated that this was fucking ridiculous. That he needed attention and it's fucking ridiculous that nobody can come in and see him." Livingston asked for everyone's name, which Towers gave him, and continued to curse at her. When Towers told Livingston that she did not have to listen to his cursing, "he lunged at [her] with his fist in the air." His right hand was balled into a fist and came within a couple of inches of her. Towers ran out of the room and reported to the charge nurse what had happened because she "was scared." Thereafter, Towers returned to Livingston's room with Patricia Drayton, a nurse, who tried to calm him down. He continued to be irate and to curse, however.

Towers also testified that, on other occasions, Livingston was in the anteroom without a mask on. She stated:

There would be times when instead of ringing his bell [Livingston] would come to the door of the anteroom, which there's a small window there and look out for somebody without his mask on. And that's concerning because that's where we gear up. And then there would be times if I went into his room to do things, and then when I left I'd take everything off and he'd open the door and ask me a question when I was not protected.

Patricia Drayton testified that Livingston had, on occasion, left his room without wearing a protective mask. She stated that, at one time, when he was placing his dinner tray in the anteroom, she advised him he could not do so. On a couple of occasions, he went into an unoccupied adjoining isolation room and used a telephone and the bathroom without wearing a mask.

Drayton also testified about the incident in which Livingston lunged at Towers. According to Drayton, after Towers reported the incident to her, she went to Livingston's room. As she entered, he jumped up out of a chair by the door, faced her, and started cursing. She backed out of the doorway because she felt threatened. Drayton told Livingston he could

not threaten her staff. When he denied doing so, Drayton said she would report to the supervisor Towers's claim that Livingston had lunged at her.

Livingston testified on his own behalf. He claimed he never was given a copy of any rules about use of the protective mask, and that he received conflicting information from hospital staff members about when and where he had to wear the mask. According to Livingston, Gravenor told him he had to wear a mask when he left his room, but that he could take the mask off outside if no people were around, although "if somebody was within five feet of [him,] [he] was supposed to have a mask on." He also was told that he could go outside and, as long as he told a staff member he was doing so, there were no restrictions on how long he could stay out. On one occasion, after he told a staff member he was going outside, he fell asleep on a bench on the hospital grounds. He later was awakened by a nurse who told him that people were looking for him and did not know where he was. Subsequently, his privilege to leave his room was suspended.

Livingston further testified that he was not required to wear a mask while in his room, and that he never was told that he had to wear a mask while in the anteroom. He would place his dirty laundry in a basket in the anteroom and his cup in the anteroom when he needed ice. His food trays were left on the floor of the anteroom for him to pick up. He testified:

> I was never told to wear the mask while I was in the room or when I changed my laundry or anything, the room that's coming into my room, nobody never told me I had to put a mask on when I put the laundry and stuff in the basket. That's the door they're talking about me looking out whatever, I was never told that, sir. I mean, I would have done it if I knew it, but when I seen somebody coming towards my room, I was trying to get my mask on, you know, I'd catch myself.

Livingston denied ever going out the door of the anteroom into the hospital hallway without wearing a mask. He also denied ever driving his vehicle off the hospital grounds. He admitted that every morning he went outside to warm up his

vehicle and, on one occasion, he moved his vehicle from one space to another "for it to warm up" because it had been sitting unused for a while.

Livingston acknowledged that he had had a conversation with Rolf in which he said he had to get out of the hospital or he would end up hurting someone. He denied having any plans to hurt Rolf, and attributed his feelings to "the frustration [he] was going through, the way [he] was being treated, and stuff of that nature." Livingston also acknowledged becoming "a little agitated" when a nurse did not respond to his request for cream for a rash on his neck. According to Livingston, Towers never came back to his room to tell him that the nurse was dealing with another situation and, when no nurse arrived after 45 minutes, he "felt kind of bad about that."

In finding Livingston guilty of failing to comply with the placement ordered by the Secretary, under H–G section 18–325(a), the trial judge stated:

Now, I think clearly within the context of treatment and quarantine, an order to Mr. Livingston that he stay—after February when his grounds privileges were revoked, it's clear to me that he had been instructed that he was to remain in his room and that it was only within his room that he did not have to wear a mask, if he left his room he had to wear a mask. And I think it's clear also that he was under some circumstances, conditions at times permitted to go into the anteroom, but if he did so he had to wear his mask. And it's clear from the testimony of a number of witnesses that he did not do so on a number of occasions.

And I think that clearly falls within the scope of the initial order paragraph of State's Exhibit 1. And I note that 18–325(a) states that an individual may not refuse to comply with the placement ordered under Section 18–324 of this subtitle, and 18–324 of the subtitle provides that the order for placement can contain other conditions as the Secretary believes are necessary and those other conditions were, of course, that he be quarantined and submit to the treatment that was required.

So it seems to me clear that these failures on his part, which I find to be established beyond a reasonable doubt, did violate the terms of and were failures to comply with the terms of the placement order.

As already noted, the trial judge also found Livingston guilty of behaving in a disorderly manner, under H–G section 18–325(b)(1). The judge explained:

Well, with respect to count two, which is the disorderly conduct, I agree with [defense counsel] that the [s]tatute does not give us a great deal of help in defining disorderly conduct. And I think it's reasonable to look at the criminal statute for disorderly conduct for some guidance. But I think also that this particular provision has to be interpreted with respect to the context in which it is used, and it is disorderly conduct in a treatment facility for tuberculosis. So what may or may not be disorderly conduct in the rest of the world may provide guidance but is not controlling, I don't think.

And it seems clear to me that with respect to Mr. Livingston's contact in dealing with Ms. Towers on March 16th and with Nurse Drayton that it did—I am satisfied beyond a reasonable doubt that Mr. Livingston is guilty with respect to count two based on that. I will say just for clarity, I don't include Ms. Abbott in that, the facts and circumstances are such she opens the door and he's standing at the door, it could be that he was lurking there to startle her but it could be that he simply happened to be there and it was sort of incidental or accidental contact that brought him that close to her. He was in the room, he wasn't required to wear a mask within the room, so I'm not really considering the evidence with respect to Ms. Abbott in reaching this decision with respect to count two.

## DISCUSSION

### I.

Livingston contends that H–G section 18–325(b)(1), which criminalizes behaving in a disorderly manner at a placement

for tuberculosis treatment, is unconstitutionally vague because it does not provide fair notice of the conduct proscribed and fails to provide legally fixed standards and adequate guidelines for triers of fact.

The State responds that Livingston did not raise this issue below and that it lacks merit in any event.

### (a)

■ At the close of the State's case, defense counsel moved for judgment of acquittal on all charges, including Count 2 (behaving in a disorderly manner in violation of H–G section 18–325(b)(1)). In support of his argument on that count, he maintained that the phrase "disorderly manner" should be given the same meaning that has been applied to that phrase as used in Md.Code (2002) section 10–201(c)(2) of the Criminal Law Article ("CL"), which prohibits "willfully act[ing] in a disorderly manner that disturbs the public peace." Defense counsel asserted that Livingston's behavior did not constitute acting in a disorderly manner within that meaning because the evidence established only that he had expressed his views "in a loud manner." Alternatively, defense counsel asserted that, if the trial court rejected the argument that "disorderly manner" is a term of art as used in CL section 10–201, and instead analyzed the meaning of the phrase by way of the common usage of the word "disorderly," the statute would be "void for vagueness because we don't know what disorderly behavior is[,]" and a law must "put one on notice as to what behavior is to be anticipated."

The court denied Livingston's motion for judgment of acquittal on Count 2. At the close of all the evidence, defense counsel renewed the motion, stating, in part, that as to Count 2 he would "submit on arguments previously submitted." The trial court denied the motion for judgment of acquittal on Count 2. The judge acknowledged that the Criminal Law Article offers some guidance in ascertaining the meaning of "disorderly manner," but reasoned that the phrase must be interpreted by common usage in the context of conduct in a treatment facility for tuberculosis. In so ruling, the judge

implicitly rejected Livingston's void-for-vagueness argument. Accordingly, the constitutional issue both was raised in, and decided by, the trial court, and is preserved for our review. Md. Rule 8–131(a) (stating that a non-jurisdictional issue is preserved for appellate review when it was raised before or decided by the circuit court).

### (b)

 In deciding the constitutionality of a statute, we begin with the presumption that the statute is valid. *Galloway v. State*, 365 Md. 599, 610, 781 A.2d 851 (2001), *cert. denied*, 535 U.S. 990, 122 S.Ct. 1547, 152 L.Ed.2d 472 (2002). We will not find a statute unconstitutional if, " 'by any construction, it can be sustained.' " *Id.* at 611, 781 A.2d 851 (quoting *Beauchamp v. Somerset County*, 256 Md. 541, 547, 261 A.2d 461 (1970)). When the challenge to a statute is based on vagueness, the burden of establishing unconstitutionality is on the party attacking the statute. *Id.* As the Court of Appeals explained in *Galloway*, however, when

> a statute violates a "mandatory provision" of the Constitution, "we are required to declare such an act unconstitutional and void." . . . Therefore, if it is established that the statute is vague—offends due process—and/or overbroad—sweeps within the ambit of constitutionally "protected expressive or associational rights"—then the statute is unconstitutional.

*Id.* (footnote omitted).

 The "void-for-vagueness doctrine," as applied to the analysis of penal statutes, requires courts to consider two criteria. The first criterion is that a statute must be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Eanes v. State*, 318 Md. 436, 459, 569 A.2d 604 (1990) (internal quotations omitted) (citation omitted). "The standard for determining whether a statute provides fair notice is whether persons of common intelligence must necessarily guess at [the statute's] meaning." *Galloway*, 365 Md. at 615, 781 A.2d 851 (internal quotations omitted) (citation omitted) (alteration in

original). "A law is not vague simply because it requires conformity to an imprecise normative standard." *Eanes,* 318 Md. at 459, 569 A.2d 604. Nor is a statute vague under the fair notice principle "if the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, *if* they possess a common and generally accepted meaning." *Galloway,* 365 Md. at 615, 781 A.2d 851 (internal quotations omitted) (citations omitted) (emphasis in original).

The second criterion pertains to enforcement. It requires "that criminal statutes provide 'legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws.'" *Id.* at 615–16, 781 A.2d 851 (quoting *Williams v. State,* 329 Md. 1, 8–9, 616 A.2d 1275 (1992)). Commenting on this criterion, the Court of Appeals in *Galloway* stated:

> To survive analysis, a statute must "eschew arbitrary enforcement in addition to being intelligible to the reasonable person." *Williams,* 329 Md. at 9, 616 A.2d at 1279.
>
> * * *
>
> [A] statute is not unconstitutionally vague merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle.

*Galloway,* 365 Md. at 615–16, 781 A.2d 851 (some citations and quotations omitted).

█ As noted above, the statutory provision at issue in the case at bar states that, "[w]hile an individual is in any placement for tuberculosis treatment, the individual may not: (1) Behave in a disorderly manner." H–G § 18–325(b)(1). We conclude that this statute is not vague under the fair notice principle, nor does it fail to provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact

and others whose obligation it is to enforce, apply and administer the penal laws.

There is a common and generally accepted meaning to the phrase "disorderly manner" that can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, and treatises. As the trial judge and the parties recognized, Maryland courts have opined upon the meaning of "disorderly" as it pertains to the disorderly conduct offense codified at CL section 10–201(c)(2), which prohibits a person from "willfully act[ing] in a disorderly manner that disturbs the public peace." It often has been stated that "[t]he gist of the crime of disorderly conduct ... as it was in the cases of common law predecessor crimes, is the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area." *Drews v. State,* 224 Md. 186, 192, 167 A.2d 341 (1961). *See also Spry v. State,* 396 Md. 682, 691–92, 914 A.2d 1182 (2007); *Dziekonski v. State,* 127 Md.App. 191, 200–201, 732 A.2d 367 (1999) (quoting *Reese v. State,* 17 Md.App. 73, 80, 299 A.2d 848 (1973)); *Streeter v. State,* 5 Md.App. 435, 438–439, 248 A.2d 119 (1968).

■ Beyond the guidance provided by cases involving the crime of "disorderly conduct," we agree with the trial court that the specific phrase at issue here, "disorderly manner" as used in H–G section 18–325(b)(1), must be interpreted by considering its common meaning *in the context of a treatment facility* for tuberculosis. "Disorderly" is defined as "not in order," "irregularly," "confusedly," "turbulent," and "unruly." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 652 (2002). It is also defined as "engaged in conduct offensive to public order," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 360 (11th ed. 2005), and "[c]ontrary to the rules of good order and behavior; violative of the public peace or good order; turbulent, riotous, or indecent." BLACK'S LAW DICTIONARY, 422 (5th ed. 1979).

Whereas disorderly conduct offenses generally are concerned with maintaining public peace and order, behaving in a

disorderly manner in a tuberculosis treatment facility requires consideration of the purpose of the statute, which is to prevent and control the spread of tuberculosis; the purpose of medical quarantine, which is to safeguard the public health; the need to maintain peace and order within the treatment facility; and, the need to ensure the safety of medical professionals, staff members, other patients, visitors, and the public at large. When we consider the plain language and purpose of the statute together with prior judicial constructions of the more general crime of "disorderly conduct," we conclude that the statute is sufficiently definite to inform a person of ordinary intelligence of the nature of the activity proscribed.

The gist of the crime of behaving in a disorderly manner while in a placement for tuberculosis treatment under H–G § 18–325(b)(1), "is the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people in the area" of the tuberculosis patient. *Drews, supra,* 224 Md. at 192, 167 A.2d 341. As with disorderly conduct offenses under the Criminal Law Article, it includes conduct " 'of such a nature as to affect the peace and quiet of persons in or around the tuberculosis treatment facility who may witness the same and who may be disturbed or provoked to resentment thereby.' " *Id.* (quoting 3 Underhill, *Criminal Evidence, Sec.* 850 (5th ed.)). It is evident that, within the context of a treatment center for people with communicable tuberculosis, that conduct would include willful actions that would tend to expose health care workers and other non-patients to the disease. Accordingly, Livingston's void-for-vagueness argument fails.

## II.

Livingston contends the evidence adduced at trial was legally insufficient to support his convictions for refusing to comply with the Secretary's placement order between February 15 and March 16, 2008, in violation of H–G section 18–325(a), and for behaving in a disorderly manner, in violation of H–G section 18–325(b)(1).

 In deciding a sufficiency of evidence contention respecting a criminal conviction, we must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Allen v. State,* 402 Md. 59, 71, 935 A.2d 421 (2007) (quoting *Rivers v. State,* 393 Md. 569, 580, 903 A.2d 908 (2006)). When evaluating the sufficiency of the evidence in a non-jury trial, we will not set aside the judgment of the trial court on the evidence unless it is clearly erroneous, giving due regard to the trial judge's opportunity to judge the credibility of the witnesses. Md. Rule 8–131(c); *State v. Raines,* 326 Md. 582, 589, 606 A.2d 265, *cert. denied,* 506 U.S. 945, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992).

### A. Refusing to Comply with the Secretary's Placement Order

 As discussed above, H–G section 18–324(b)(1) permits the Secretary or a health officer to order an individual who has tuberculosis that "endangers, or may endanger, the public health of the community, ... to receive appropriate medical care." Subsection (b)(2) further provides that, "[i]f the individual fails to comply with the order," he may further be ordered into "medical quarantine in order to protect the public health." H–G § 325(b)(2).[4] The clear purpose of this statute is to afford a person with communicable tuberculosis appropriate medical care and quarantine to prevent and control the spread of tuberculosis in order to protect the health of the community.

On February 4, 2008, the Secretary issued an order respecting Livingston pursuant to H–G section 18–324(b). The order provided, in relevant part:

---

4. Three types of quarantine may be ordered: "(i) Medical isolation at home; (ii) Domiciliary care, nursing home care, or hospital care; or (iii) Other medically appropriate living arrangement." H–G § 18–325(b)(2).

**I HEREBY ORDER** you to medical treatment and quarantine at Deer's Head Hospital for treatment of your tuberculosis. Your quarantine will continue until such time as your doctors, the Prince George's County Health Department, and the Division of Tuberculosis Control of the Maryland Department of Health and Mental Hygiene determine that you are well enough to return home and no longer pose a risk to others.

**IN ADDITION, I HEREBY ORDER** you to comply with all medications and diagnostic tests ordered by your doctor.

Livingston contends that, while the above order required him to enter the hospital, it did not require him to don a mask upon leaving his isolation room and entering the anteroom, and therefore a reasonable trier of fact could not reasonably have found on the evidence adduced that he refused to comply with the placement order.

Livingston's reading of the placement order is unreasonably narrow. To be sure, it required him to admit himself to the hospital, and he did so. It further mandated, however, that he be quarantined at the hospital and obtain medical treatment until it was determined, among other things, that he no longer posed a risk to others. The hospital, not Livingston, determined the conditions necessary to establish a quarantine and treat Livingston for tuberculosis. The evidence presented at trial clearly established that Livingston knew the conditions of his quarantine and violated them by leaving his isolation room and entering the anteroom without a mask and by going outside the hospital building without a mask, all when other people were in his vicinity.

Gravenor testified that she told Livingston he had to wear a mask before coming out of his room into the anteroom or hospital hallway. Thereafter, she observed him seated in his vehicle without a mask on and, on one occasion, witnessed him, maskless, opening the door to the anteroom while she was in it and before she had donned her protective equipment. Rolf similarly testified that Livingston entered the anteroom without wearing a mask, and Insley observed Livingston near his

vehicle without a mask. Mathews also advised Livingston that he could not leave his hospital room without wearing a mask. Thereafter, she observed him enter the anteroom without a mask on. Towers likewise observed Livingston either outside the hospital building or in the anteroom without a mask. Finally, Drayton observed Livingston, without a mask on, placing his dinner tray in the anteroom and entering an unoccupied adjacent isolation room to use the telephone and the bathroom.

The testimony of these witnesses plainly was sufficient to support the trial court's finding that Livingston failed to comply with the Secretary' placement order for him.

### B. Acting in a Disorderly Manner

Livingston next contends the evidence was legally insufficient to support his conviction for behaving in a disorderly manner. Specifically, he argues that, because he was in his assigned isolation room when he lunged at Towers, and no one else was present, he did not offend, disturb, incite, or tend to incite any of the people gathered in the same area. In addition, he maintains that his words, "this is fucking ridiculous," could not be the basis for a disorderly conduct conviction because they were protected under the First Amendment. They were not "fighting words," or words tending to arouse prurient sexual desire or to cause an immediate breach of the peace, which are not afforded constitutional protection.

Respecting the incident in question, Towers testified that, when she first responded to Livingston's call bell, he was in the anteroom with his mask off but around his neck. She asked him to put his mask on while she stepped out of the room. Once Livingston put on the mask, Towers reentered the room, and Livingston told her that he had a rash on his neck and needed a nurse to put Benadryl cream on it. Towers said she would let the nurse know about his request, and she did. About a half hour to 45 minutes later, Towers responded to another call from Livingston, who complained that the amount of time he had waited for a nurse was "fucking ridiculous." When Towers stated that she did not

have to listen to his cursing, Livingston "lunged at [her] with his fist in the air," and "stepped towards" her, causing her to run out of the room in fear. She further described him as acting "irritated," "frustrated," "angry," and "emotional."

Drayton said that, when she later went to Livingston's room to advise him that he could not threaten her staff members, he was seated. He appeared "angry" and, as she was talking to him, "he just jumped up out of the chair and faced [her]." At that point, Drayton started to back out of the door because she "felt threatened."

Thus, although Livingston's words and actions may not have offended, incited, or disturbed "a number of people gathered in the same area," they most certainly disturbed and offended the nurses who were trying to treat him. These facts demonstrate why the crime of "behav[ing] in a disorderly manner" under H–G section 18–325(b)(1) cannot be entirely synonymous with the general crime of disorderly conduct, and must be understood in the context of the statutory scheme in which it appears. *See, e.g., Gilmer v. State,* 389 Md. 656, 663, 887 A.2d 549 (2005) (stating that the interpretation of a statute must " 'consider not only the ordinary meaning of the words, but also how that language relates to the overall meaning, setting, and purpose of the act.' " (quoting *Moore v. State,* 388 Md. 446, 453, 879 A.2d 1111 (2005))).

■ The primary purpose of Part IV of Title 18 is to protect the public health by ensuring that individuals infected with communicable tuberculosis receive proper treatment. *See generally,* H–G § 18–324. More specifically, the crime of behaving in a disorderly manner applies to individuals such as Livingston whom the Secretary has ordered into a placement for tuberculosis treatment because their condition "endangers, or may endanger, the public health." H–G § 18–324(b)(1). Rarely will such individuals offend or disturb "a number of people gathered in the same area" (no matter how outrageous their conduct) by simple virtue of the fact that their treatment regime limits their contact to a small number of health care providers. Accordingly, an individual ordered into a place-

ment for tuberculosis treatment "behave[s] in a disorderly manner" by acting in way that frustrates the ability of those health care providers to give that individual, or other patients, proper treatment. The evidence here was more than sufficient to show that Livingston, by speaking to the nurses in a profane manner and threatening them, interfered with their ability to render appropriate medical care to him.

Livingston's claim that his statement "this is fucking ridiculous" was not sufficient to violate H–G section 18–325(b)(1) does not accurately reflect the basis for the trial court's ruling. Granted, Livingston's words alone may not have been sufficiently disturbing, inciteful, or obscene to qualify as "behav[ing] in a disorderly manner;" however, the judgment of the trial court (and our holding here) accounted for both his words *and conduct*. The testimony of the nurses—which the trial court clearly credited—established that Livingston acted in an assaultive and threatening manner toward them and that his offensive and disruptive words *and* actions disturbed the orderly operation of the tuberculosis treatment facility. Moreover, regardless of what Livingston said, the testimony about his conduct alone supported a reasonable finding that he behaved in a disorderly manner in violation of H–G section 18–325(b)(1). Accordingly, we reject Livingston's argument that the evidence was legally insufficient to support his conviction for behaving in a disorderly manner while in a placement for tuberculosis treatment.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**