REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 765

September Term, 2013

---

BRUCE JOHN BEATTIE

v.

STATE OF MARYLAND

---

Zarnoch,
Graeff,
Hotten,

JJ.

---

Opinion by Graeff, J.

---

Filed: March 27, 2014

Appellant, Bruce Beattie, was convicted in the Circuit Court for Baltimore County of criminally negligent manslaughter, reckless driving, negligent driving, failing to obey the driving rules for laned roadways, and making an illegal U-turn. The court sentenced appellant to one year incarceration for the conviction of criminally negligent manslaughter.[1]

On appeal, appellant presents two questions for our review, which we have rephrased slightly:

1.    Did the circuit court err in denying appellant's motion to dismiss the indictment on the ground that Md. Code (2011 Supp.) § 2-210 of the Criminal Law Article ("CL"), governing criminally negligent manslaughter, is unconstitutionally vague?

2.    Was the evidence sufficient to support appellant's conviction for criminally negligent manslaughter?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of October 22, 2011, appellant, a commercial tractor trailer driver, was driving eastbound on I-70, when he realized he was lost. He called Charles Cobb, a driver with the same company, for help with directions. Appellant called Mr. Cobb using a hands-free headset in his truck, and they spoke for approximately twenty minutes.

Appellant told Mr. Cobb that he was on I-70 east. Mr. Cobb advised that I-70 "dead ends into a park and ride," and appellant needed to be driving on I-70 west. Appellant pulled

---

[1] The court merged appellant's remaining convictions into his conviction for criminally negligent manslaughter. It also recommended work release.

over and attempted to locate a map, but he could not find one. He then looked around and saw a "center pull through" area in the median, leading to I-70 westbound.

Appellant was aware that he was not allowed to use the pull through area, which was a break in the grassy median for emergency vehicles.[2] He was wary, however, to get off the highway at an exit that might not take him in the direction he needed to go. Observing that there was "hardly any traffic on the road," appellant looked around the bend in the road and saw that "everything was clear" for about a quarter of a mile. He was unable to see anything beyond that point due to the curve in the road behind him. Appellant decided to pull out from the shoulder of the road and cross the three lanes of I-70 east to turn around using the emergency access in the median. Before pulling out from the shoulder into the travel lanes, appellant looked for oncoming traffic, but after he pulled out, he was looking across the roadway toward the median.

As he pulled onto the highway to attempt to reach the median, appellant told Mr. Cobb that "two vehicles were bearing down on him at a high rate of speed." He stated that one vehicle appeared to pass him, and then stated: "I think someone ran into me." He felt the impact when his vehicle was halfway between the shoulder and the median. While still on the line with Mr. Cobb, appellant got out of the truck to inspect the damage, and upon

---

[2] Next to the emergency vehicle crossover was a sign stating: "For use of authorized and emergency vehicles only." Appellant acknowledged at trial that his tractor trailer was not an authorized or emergency vehicle.

returning stated: "I believe this person has passed. I gotta go. I have, I have to call 911." The driver of the vehicle that collided with appellant's truck was Michael Neimus.

Mr. Neimus' friend, Raymond Bradshaw, testified that he met Mr. Neimus at 10:00 p.m. the evening of October 21, 2011, at Union Jack's, a restaurant and bar in Columbia. The two men stayed at the bar for several hours, talking and drinking, and they left "a little bit before closing," just prior to 2:00 a.m. on October 22, 2011. Mr. Bradshaw and Mr. Neimus lived close to each other in Baltimore County, and after leaving the bar, they planned to go to one of their houses. They drove in their respective cars toward their homes. Mr. Neimus was driving in front of Mr. Bradshaw in the middle lane of I-70.

As they crossed over an overpass, Mr. Bradshaw saw a truck on the shoulder of the road. Immediately after he saw the truck, the truck "swung out" from the shoulder onto the roadway, leading him to believe the truck was taking a wide turn to get back onto the road. The truck, however, did not get into one of the eastbound lanes, but rather, it "kept on coming," blocking "the whole highway." Mr. Bradshaw and Mr. Neimus both swerved into the left lane to try to avoid the truck, and then swerved back to the right as the truck blocked the roadway. Because Mr. Bradshaw was several car lengths behind Mr. Neimus, he had more time to move to the right. Mr. Neimus could not get to the right of the truck fast enough, and he hit the back right side of the truck before driving off the road. Crash reconstruction experts at the scene determined that Mr. Neimus was less than a foot away from avoiding the truck completely.

-3-

Both Mr. Neimus and Mr. Bradshaw were driving approximately 65 miles per hour at the time they went over the overpass and saw the truck; the speed limit on that portion of I-70 was 65 miles per hour. After Mr. Bradshaw successfully swerved around the truck, he pulled over and stopped his car. He approached Mr. Neimus' vehicle and saw that Mr. Neimus' truck had fire underneath it, and Mr. Neimus' body had been pushed into the backseat. Mr. Bradshaw tried to get Mr. Neimus to respond, but he realized "it was done."

Mr. Bradshaw stayed at the scene of the accident and waited for the police and paramedics to arrive. He gave oral and signed written statements to police describing what he observed. Investigators at the crash scene recovered one gram of marijuana from Mr. Neimus; Mr. Bradshaw was unaware that Mr. Neimus had marijuana on him. Mr. Neimus' blood alcohol level later was determined to be .14.[3]

Trooper Boyce, a member of the Maryland State Police, received a call at 2:57 a.m. regarding a collision on I-70 eastbound. When he arrived at the scene, he saw a Silver Chevy Tahoe on the right shoulder with "heavy front end damage" and a white tractor trailer in the

---

[3] Maryland Code (2011 Supp.) § 21-902(a)(2) of the Transportation Article ("TR"), "Driving under the influence or impairment of alcohol," prohibits a person from driving while impaired by alcohol or driving "while the person is under the influence of alcohol per se." "'Under the influence of alcohol per se' means having an alcohol concentration at the time of testing of 0.08 or more as measured by grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath." TR 11-174.1(a).

emergency vehicle crossover. The fire department had all lanes on I-70 blocked due to the collision.

Trooper Boyce approached the Chevy Tahoe and saw that the driver, Mr. Neimus, was deceased. Thereafter, he spoke to appellant. Appellant initially told Trooper Boyce that he had pulled his truck onto the right shoulder in order to look at a map, and he was struck from the rear by another vehicle. Trooper Boyce asked appellant to memorialize his account on a Driver Witness Statement form, and appellant recounted the same version of events that he told Trooper Boyce.

Trooper Bedell, the Collision Investigator for the Maryland State Police Crash Team and an expert in the field of accident reconstruction, responded to the scene at approximately 4:30 a.m. He read the witness statements provided by appellant and Mr. Bradshaw. He then approached appellant, who was still at the scene, and they walked the area of the collision together. Appellant gave Trooper Bedell an account of the accident that matched his written statement, asserting that he had been on the right shoulder looking at a map with his hazard lights on, and as he began to pull out into traffic, a vehicle struck the rear of his trailer. After the impact, appellant pulled into the emergency vehicle crossover area. Trooper Bedell asked appellant why he had pulled into the crossover after the accident, rather than stopping in the right lane where he was struck, or pulling back onto the shoulder. Upon this line of questioning, appellant became nervous.

Trooper Bedell and appellant continued to walk the collision site, and when the area was cleared of emergency vehicles, Trooper Bedell was able to see various scrapes and other markings on the roadway. Based on the markings and other indications of where the impact had occurred, Trooper Bedell asked appellant whether he was intending to use the emergency vehicle crossover by driving from the right shoulder across the highway, requiring the two vehicles driven by Mr. Neimus and Mr. Bradshaw to swerve left and then right to avoid him. At that point, appellant stated that he wanted to revise his written statement.

Appellant's revised witness statement provided that, after he determined he was going east rather than west on I-70, he pulled onto the shoulder. He then pulled onto the roadway and began to make a U-turn. Prior to pulling out onto the road, appellant looked both ways and did not see any oncoming traffic. As he was turning, he did not see a car approach, but he felt an impact when the vehicle collided with the back of his truck. In response to a question on the form asking if the accident could have been avoided, appellant answered in the affirmative, stating that he "shouldn't have made the U-turn."

At the accident scene, Trooper Bedell asked appellant whether he was on a cell phone at the time of the collision, and appellant replied that he was not. Trooper Bedell also asked appellant whether he was in possession of any hands-free devices, and appellant stated that he did not have a hands-free device inside his vehicle. Trooper Bedell subsequently searched

appellant's truck pursuant to a warrant, and he did not locate a hands-free device.[4] Later in his investigation of the collision, Trooper Bedell obtained appellant's cell phone records. He learned that appellant had made a cell phone call to Mr. Cobb prior to the collision that lasted approximately 20 minutes, continuing past the time of the collision.

At appellant's trial, Trooper Bedell described the accident scene. The portion of I-70 where the collision occurred was three lanes wide, with two shoulders. Each lane was 12 feet wide, and the shoulders were 9 to 10 feet wide; the roadway was 56 feet from edge to edge. Appellant's tractor trailer was approximately 70 feet long. Appellant's attempt to make a U-turn on the emergency vehicle crossover, which was a break in the grassy median between I-70 east and west, left tire marks on the roadway, which Trooper Bedell used to verify the path of the vehicle.

As part of his investigation, Trooper Bedell obtained the "black boxes" from both the tractor trailer and the Chevy Tahoe, which contained computer information from both vehicles. From the black box, as well as from vehicle marks at the scene and other data, Trooper Bedell determined that Mr. Neimus was traveling 62 miles per hour at the time he first swerved to attempt to avoid appellant's vehicle, which occurred 112 feet from impact. Using the black box from appellant's vehicle, he determined that appellant pulled onto the highway from the shoulder and accelerated to 10.5 miles per hour within 7 seconds before

---

[4] Appellant testified that when he left the accident scene he took his phone and his headset with him.

impact, when he slowed to a stop. Trooper Bedell calculated that, based on the speed of the vehicles and when appellant's truck began to pull out, Mr. Neimus had a little more than a second and a half to perceive and respond to the hazard. In his professional opinion, the cause of the accident was as follows:

> [T]he cause of the collision was that the commercial vehicle had made [its] . . . turning maneuver, it had positioned [its] vehicle directly in front of the Chevrolet Tahoe in such a way that the, the available time and the available distance for a driver to respond was not enough to be able to . . . safely avoid the collision.

Prior to announcing its verdict, the court commented on the criminal negligence statute, CL § 2-210, as follows: "It's a new Statute, but it's not an overly cumbersome Statute. I don't believe that this is a difficult Statute to apply under the circumstances of this case. Maybe under another, maybe one of those other cases hypothetically referred to it may be. [B]ut not . . . in this one." The court then stated:

> This is a situation where a driver of a seventy foot tractor trailer was approximately a quarter of a mile from a curve in the road, where the speed limit is sixty-five miles per hour, in the dark, with and I note exhibit[s] show, no street lights in that area of I-70, moves from the . . . right shoulder to the far left median in one move. By his own testimony, he looked in his rear view mirror before he moved from the shoulder into the lane of travel, but didn't do so again as he crossed . . . from the middle lane to the far left lane. And that maneuver was completely unexpected for good reason. Doing so while he was on the phone hands free or not, frankly only elevates the level of negligence, but in my view the maneuver itself meets the definition of a gross deviation from the standard of care. I want to address the, the issue that was raised with regard to the victim in this case and his blood alcohol level. While it is true that level of alcohol can certainly impair one's ability to react quickly to unanticipated circumstances[,] I think the evidence is clear that, in this case at least, there was no negligence on the part of the victim in the way that he handled his vehicle. . . . And I do find that the conduct on the part of this

-8-

Defendant, while not intentional, does meet the requirements of criminal negligence was is defined in [CL § 2-210]. So, I find him guilty of count one [criminally negligent manslaughter].

The court found appellant guilty of all other charges. After merging the lesser convictions with the conviction for criminal negligent manslaughter, the court sentenced appellant to one year imprisonment. This appeal followed.

## DISCUSSION

### I.

### Void for Vagueness

Appellant's first contention is a challenge to the constitutionality of CL § 2-210, entitled "Causing death of another by operation of vehicle or vessel in criminally negligent manner." He asserts that the statute is unconstitutionally vague, and therefore, the circuit court erred in denying his motion to dismiss the indictment.

CL § 2-210, which became effective on October 1, 2011, provides as follows:

(a) In this section, "vehicle" includes a motor vehicle, streetcar, locomotive, engine, and train.
(b) A person may not cause the death of another as the result of the person's driving, operating, or controlling a vehicle or vessel in a criminally negligent manner.
(c) For purposes of this section, a person acts in a criminally negligent manner with respect to a result or a circumstance when:
(1) the person should be aware, but fails to perceive, that the person's conduct creates a substantial and unjustifiable risk that such a result will occur; and
(2) the failure to perceive constitutes a gross deviation from the standard of care that would be exercised by a reasonable person.

(d) It is not a violation of this section for a person to cause the death of another as the result of the person's driving, operating, or controlling a vehicle or vessel in a negligent manner.

(e) A violation of this section is criminally negligent manslaughter by vehicle or vessel.

(f) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.

Appellant contends that the elements of criminally negligent manslaughter are "vague and ambiguous" because they "fail to provide [a defendant] with adequate notice of the conduct prohibited." He further argues that, as written, the statute is so broad that it could be subject to irrational or selective enforcement.

The State argues that CL § 2-210 is not unconstitutionally vague. It contends that "[t]he meaning of the term 'criminal negligence' as expressly defined" in the statute "is clear on its face," and the meaning of this term "becomes no less clear when placed in the larger context of Maryland jurisprudence governing" the concept of gross negligence. The State asserts that, "[b]ecause no person of ordinary intelligence would necessarily have to guess at the statute's meaning, and because the statute provides enforcement standards narrow enough to forfend irrational and selective patterns of enforcement, the circuit court was correct to rule that [CL] 2-210 is not unconstitutionally vague."

In addressing a claim involving the constitutionality of a statute, we begin "with a presumption that the statute is constitutional." *Walker v. State*, 432 Md. 587, 626 (2013) (citing *Galloway v. State*, 365 Md. 599, 610 (2001)). The appellant bears the burden of overcoming this presumption and establishing the statute's unconstitutionality. *Id. Accord*

*Livingston v. State*, 192 Md. App. 553, 568 (2010) ("When the challenge to a statute is based on vagueness, the burden of establishing unconstitutionality is on the party attacking the statute."). We will not find a statute unconstitutional if, "'by any construction, it can be sustained.'" *Galloway*, 365 Md. at 611 (quoting *Beauchamp v. Somerset County*, 256 Md. 541, 547 (1970)).

"When considering whether a law is void for vagueness, courts consider two criteria." *State v. Phillips*, 210 Md. App. 239, 265 (2013). The first is whether the statute is "'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.'" *Id.* at 266 (quoting *Livingston*, 192 Md. App. at 568). "The standard for determining whether a statute provides fair notice is 'whether persons of "common intelligence must necessarily guess at [the statute's] meaning."'" *Id.* (quoting *Galloway*, 365 Md. at 615). "'A statute is not vague under the fair notice principle if the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves if they possess a common and generally accepted meaning.'" *Walker*, 432 Md. at 626 (quoting *McFarlin v. State*, 409 Md. 391, 411 (2009)).

The second factor for consideration under the vagueness doctrine addresses the enforcement of the statute. As this Court recently explained criminal statutes must

> "provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws." [*Livingston*, 192 Md. App. at 569.] "[A] statute is not unconstitutionally vague merely because it allows for the exercise of

-11-

some discretion on the part of law enforcement and judicial officials." *Galloway*, 365 Md. at 616. "Rather, '[i]t is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle.'" *Id.*

*Phillips*, 210 Md. App. at 266.

Here, appellant's vagueness challenge is to the term "criminal negligence" in CL § 2-210. Acknowledging that the statute creates a new legal standard,[5] he asserts that it does not clearly dictate where this standard falls between the existing concepts of "simple negligence" and "gross negligence." Therefore, he contends, "the Legislature has made it impossible" for a trier of fact to "determine the precise standard to apply."

---

[5] The Fiscal and Policy Note accompanying H.B. 363, the bill that became Md. Code (2011 Supp.) § 2-210 of the Criminal Law Article, provided, in pertinent part, as follows:

> State law does not contain a separate offense for criminally negligent manslaughter by vehicle or vessel. However, a person is prohibited from committing manslaughter by motor vehicle by causing the death of another as a result of driving, operating, or controlling a motor vehicle in a grossly negligent manner.
>
> ***
>
> A person is guilty of reckless driving if a motor vehicle is driven in wanton or willful disregard for the safety of persons or property.
>
> ***
>
> A person is guilty of negligent driving if the motor vehicle is driven in a careless or imprudent manner that endangers any property or the life or safety of any individual.

DEP'T OF LEGIS. SERVS., FISCAL AND POLICY NOTE, H.B. 363 (2011).

Appellant notes that, in several cases decided prior to the enactment of CL § 2-210, Maryland courts used the term criminal negligence interchangeably with the term gross negligence. He argues that "[t]he absence of a definition of 'criminal negligence' separate from its consistent and interchangeable use of the terms 'gross negligence' creates inherent ambiguity with its use in C[L] § 2-210." Accordingly, he asserts, a person of ordinary intelligence "would have to guess at the meaning of 'criminal negligence' as distinguished from other forms of negligence under Maryland Law," and a trier of fact would have no guidance as to "where on the spectrum this hybrid [form of negligence] would fall." We disagree.

To be sure, Maryland courts previously have used the terms criminal negligence and gross negligence interchangeably in the context of interpreting other statutory provisions. *See State v. Albrecht*, 336 Md. 475, 499 (1994) ("'It is well settled in this State that where a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself, the negligence necessary to support a conviction must be gross or criminal, *viz.*, such as manifests a wanton or reckless disregard of human life.'") (quoting *Mills v. State*, 13 Md. App. 196, 200 (1971)); *State v. Gibson*, 4 Md. App. 236, 242 (1968) (same), *aff'd*, 254 Md. 399 (1969); *Craig v. State*, 220 Md. 590, 597 (1959) (in case involving involuntary manslaughter, "if the basis of the charge be felonious negligence . . . it must have been gross or criminal negligence . . . which has been interpreted by this Court to mean []a 'wanton or reckless disregard for human life'") (quoting *Hughes v. State*, 198 Md. 424, 432 (1951)). At

the time those cases were decided, however, the only form of criminal, as opposed to civil, negligence was gross negligence.

With the enactment of CL § 2-210, however, criminal negligence is defined as a standard distinct from gross negligence. The General Assembly made clear this intent by stating that the term "'gross deviation from the standard of care' in § 2-210(c)(2) of the Criminal Law Article, as enacted by Section 1 of this Act . . . is a separate and distinct standard from the 'gross negligence' standard that is used by and interpreted under § 2-209 of the Criminal Law Article." 2011 Md. Laws Ch. 334, sec. 2.

Indeed, the elements of the offense clearly are different. CL § 2-209, manslaughter by vessel or vehicle, provides that a person may not cause the death of another by driving or operating a vehicle in a "grossly negligent manner." Gross negligence results when the defendant is "conscious of the risk to human life [posed by] his or her conduct," *Dishman v. State*, 352 Md. 279, 299 (1998), but he or she nevertheless proceeds, demonstrating "a wanton or reckless disregard for human life." *DeHoge v. State*, 190 Md. App. 532, 547 (2010). CL § 2-210, criminally negligent manslaughter, however, criminalizes the defendant's failure to perceive a substantial and unjustified risk that death would occur. Thus, the two offenses differ in the defendant's mental state, i.e., his or her consciousness of the risk of his or her conduct. *See* 96 Op. Md. Att'y Gen. 128.

Thus, there now exists a clear distinction between criminally negligent manslaughter and manslaughter by operating a vehicle in a grossly negligent manner. The question here

-14-

is whether CL § 2-210 provides constitutionally sufficient guidance regarding the proscribed conduct. We answer that question in the affirmative.

As indicated, CL § 2-210 provides that "a person acts in a criminally negligent manner" when "(1) the person should be aware, but fails to perceive, that the person's conduct creates a substantial and unjustifiable risk that such a result will occur;" and "(2) the failure to perceive constitutes a gross deviation from the standard of care that would be exercised by a reasonable person." We agree with the State that this language "is sufficiently clear that there is no need to look beyond its language to understand its meaning." *Parker v. State*, 189 Md. App. 474, 484 (2009). The statute explains the scope of criminal negligence in clear, readily understandable terms.[6]

Indeed, other courts have upheld criminally negligent homicide statutes against vagueness challenges, where the statute criminalizes the failure to perceive a "substantial and

---

[6] The General Assembly, in 2011 Md. Laws Ch. 334, provided additional guidance regarding the conduct prohibited under the new intermediate standard. It stated that its use of the term "gross deviation from the standard of care" was to "be interpreted synonymously with the term 'gross deviation from the standard of care' under § 2.02(2)(d) of the Model Penal Code," which provides as follows:

> A person acts negligently with respect to a material element of an offense when he *should be aware* of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's *failure to perceive* it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

MODEL PENAL CODE § 2.02 (emphasis added).

-15-

unjustifiable risk," and where the failure to perceive constitutes "gross deviation from the standard of care" that an ordinary person would exercise. *See Panther v. Hames*, 991 F.2d 576, 580 (9th Cir. 1993); *State v. Butler*, 880 S.W.2d 395, 397 (Tenn. Crim. App. 1994); *Thompson v. State*, 676 S.W.2d 173, 175 (Tex. Crim. App. 1984). In *Butler*, 880 S.W.2d at 397, the court stated that the statutory definition of criminal negligence related to "(1) the defendant's conduct, (2) a substantial and justifiable risk existing at the time of the conduct or resulting from the conduct, (3) the defendant's failure . . . to perceive the risk, and (4) that failure being a gross deviation from the standard of care."[7] Under those circumstances, the court held that "the statutory definition provides adequate notice of what conduct is covered."

In *State v. Randol*, 597 P.2d 672, 673 (Kan. 1979), the Kansas Supreme Court addressed a vagueness challenge to the state's vehicular homicide statute, which addressed conduct that "creates an unreasonable risk of injury to the person or property of another and which constitutes a material deviation from the standard of care which a reasonable person

---

[7] The statute provided:

"Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

TENN. CODE ANN. § 39–11–106(a)(4) (1990).

would observe under the same circumstances." *Id*. at 675. The court stated that a "material deviation" from the standard of care required "something more than ordinary or simple negligence yet something less than gross and wanton negligence." *Id*. at 676. Noting that the latter two terms "have been ingrained in our law for years and are now generally accepted and understood," it found that the statute creating a new, intermediate standard based on a "material deviation," which was the same as a "substantial deviation," was not unconstitutionally vague. *Id*. at 676-77.

These cases support our holding that CL § 2-210 is not unconstitutionally vague. The statute, which criminalizes a failure to perceive a substantial risk, when the failure constitutes a gross deviation from the standard of care exercised by a reasonable person, informs persons of ordinary intelligence of the prohibited conduct, and it provides a legally enforceable standard. The circuit court properly denied appellant's motion to dismiss the indictment.

## II.

### Sufficiency of the Evidence

Appellant next contends that the evidence was insufficient to support his conviction for criminally negligent manslaughter. His assertion in this regard mirrors his constitutional vagueness argument. He argues that "[t]he interchangeability of 'criminal negligence' and 'gross negligence' . . . create an irreconcilable ambiguity within that element of the statute," and the circuit court's failure to recognize the ambiguity in the statute's definition or to clarify that ambiguity "requires reversal of [his] convictions."

-17-

This Court recently explained the test for appellate review of evidentiary sufficiency:

[W]hether, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Coleman*, 423 Md. 666, 672 (2011) (quoting *Facon v. State*, 375 Md. 435, 454 (2003)). The Court's concern is not whether the verdict is in accord with what appears to be the weight of the evidence, "but rather is only with whether the verdicts were supported with sufficient evidence -- that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offense charged beyond a reasonable doubt." *State v. Albrecht*, 336 Md. 475, 479 (1994). "We 'must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference.'" *Cox v. State*, 421 Md. 630, 657 (2011) (quoting *Bible v. State*, 411 Md. 138, 156 (2009)).

*Donati v. State*, ___ Md. App. ___, No. 1538, Sept. Term, 2012, slip op. at 28-29 (filed Jan. 29, 2014).

Here, the circuit court made extensive factual findings in support of its verdict, which appellant does not contest. Specifically, the court found that appellant drove his 70-foot tractor trailer, in the dark, across three lanes of traffic on a highway where the speed limit was 65 miles per hour. Due to his location near the curve of the road, he could see only a distance of a quarter mile.

This evidence supports the court's finding that appellant's conduct created a substantial and unjustifiable risk of death, and his failure to perceive this risk was a gross deviation from the standard of care that would be exercised by a reasonable person. The

evidence was sufficient evidence to support appellant's conviction for criminally negligent vehicular manslaughter.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**